[No. 13584-1-II. Division Two. April 2, 1993.]

THE STATE OF WASHINGTON, *Respondent,* v. HARVEY L. RUSSELL, *Appellant.*

*Thomas E. Doyle* and *Robert M. Quillian*, for appellant (appointed counsel for appeal).

*Patrick D. Sutherland, Prosecuting Attorney,* and *Rodney G. Franzen, Deputy,* for respondent.

SEINFELD, J. — Harvey L. Russell appeals his conviction for homicide by abuse of his 20-month-old son. He makes 33 assignments of error, challenging the constitutionality of the statute, a claimed lack of unanimity in the verdict, and his exceptional sentence. He also claims evidentiary errors, insufficiency of the evidence, ineffective assistance of counsel, and improper reference to his post-*Miranda* silence. We affirm.

Derik Russell was born on July 29, 1987, to Harvey Russell and Marsha Antonelli. Derik died on March 18, 1989. He lived with his parents for only 8 to 9 months of his short life, spending the remainder of his time with foster parents or with relatives.

On the evening of Derik's death, Antonelli left Russell alone with their two children while she went to the store. Russell somehow became locked out of their residence. He pounded on the door and yelled at Derik to let him in before breaking the door to gain entry. Neighbors then heard thumping sounds, a baby's cries, and a man's voice saying "Wake up".

When Antonelli returned, Russell told her not to go into the bedroom because he had put Derik to bed. Later, when Antonelli was able to check on Derik, she found him limp,

pale, and moaning. Russell resisted her efforts to obtain medical treatment for the child, but Antonelli eventually prevailed. Derik died before he arrived at the hospital.

Medical testimony indicated that Derik was killed by a severe blow to his abdomen which ruptured his liver, causing internal bleeding and severe pain. Brass knuckles probably caused the bruise marks on Derik's abdomen. Derik also was struck several times on the head with brass knuckles. Earlier that day Russell had obtained a pair of brass knuckles that once belonged to his grandfather.

Derik had sustained other serious injuries prior to the last fatal assault. In late November 1987, when he was 4 months old, Russell and Antonelli took Derik to Mary Bridge Hospital because he was throwing up and refusing to eat; a doctor diagnosed flu. However, when Derik returned to the hospital a few days later, the doctors realized that the child's head was abnormally swollen and they transferred him to Children's Hospital in Seattle.

The doctors at Children's Hospital discovered that Derik had previously suffered a linear skull fracture and subdural hematomas,[1] probably as the result of a single traumatic occurrence. They diagnosed these injuries as occurring several weeks before admission, sometime before October 26, 1987. Derik had also previously suffered a fractured clavicle or collarbone.

The doctors also determined that Derik had been injured 2 to 5 days prior to his admission to the hospital. That injury caused retinal hemorrhages[2] and bleeding beneath the arachnoid brain membrane, resulting in pressure on the brain and seizures. According to the medical testimony, it was extremely unlikely that the cause of Derik's head injuries was accidental. However, the clavicle could have fractured in an accidental fall.

---

[1] A subdural hematoma is a collection of fluid beneath the dura membrane surrounding the brain.

[2] A retinal hemorrhage is bleeding behind and into the back of the eyes.

When Derik left Children's Hospital, Child Protective Services placed him in foster care. He returned to his parents on July 7, 1988. Antonelli gave birth to a daughter, Vanessa, on August 22, 1988.

Following Vanessa's birth, Russell and Derik visited Antonelli at the hospital. A nurse observed Russell roughly dump Derik at the foot of Antonelli's bed "like a sack of potatoes", and heard Russell "meanly" tell the 1-year-old to sit there and be quiet. She reported her observations to Child Protective Services.

At the end of August 1988, Antonelli observed Derik's nose begin to bleed without any apparent reason. A relative also noted bruises on the infant's neck and reported the two injuries to Child Protective Services. Following the reporting of Derik's unusual bruise, Russell remarked that "the next thing you know Angel [the relative] is going to say somebody picked him up by the hair of the head and hit him in the nose." That day, Derik also had a rash on his head that Antonelli had thought was caused by a new shampoo.

Derik resided with his parents until September 9, 1987, when Child Protective Services placed him with another relative. Derik returned to his parents on December 22, 1988. In February of 1989, he and his mother moved in with Antonelli's parents while Russell served time in jail. Russell killed Derik shortly after his release from jail.

At trial, Russell admitted that he had caused Derik's death, but he denied previously engaging in a pattern or practice of assaulting his son. However, the State produced evidence linking Derik's earlier injuries to Russell. On October 19, 1987, the approximate time of Derik's first head injury, Antonelli came out of the shower and discovered Derik pale and limp, making an unusual cry. Russell, the only person who had been with Derik, resisted, as he did later, Antonelli's suggestion that they take Derik to the hospital.

Derik's shoulder injury might have occurred shortly prior to the time Derik visited a Dr. Nelson in Chehalis in late

October 1987. Both Russell and Russell's mother observed then that Derik was favoring his shoulder.

The State produced evidence indicating that the second head injury may have occurred on November 29, 1987. Several witnesses testified that Russell on that day had said that Derik (then 4 months old) needed discipline and should be placed in a boy's reform school. Those present took this remark as a joke.

At sentencing Russell acknowledged that he had previously assaulted Derik and caused the two earlier head injuries, but continued to deny responsibility for other assaults alleged by the State. Through counsel, he explained that his assaultive conduct was motivated by anger.

## HOMICIDE BY ABUSE

The Legislature enacted the homicide by abuse statute, RCW 9A.32.055,[3] in response to the Eli Creekmore killing. *See State v. Creekmore*, 55 Wn. App. 852, 868, 783 P.2d 1068 (1989), *review denied*, 114 Wn.2d 1020 (1990). The statute applies to those who kill particularly vulnerable victims: children under 16, dependent adults, or developmentally disabled persons. The death must be caused "under circumstances manifesting an extreme indifference to human life"; neither premeditation nor intent is required. RCW 9A.32-.055. However, the State is required to prove that the defendant "previously engaged in a pattern or practice of assault or torture" of the person killed. RCW 9A.32.055. For sentencing purposes, the crime is equal in seriousness to first degree murder. RCW 9.94A.320.

---

[3]The text of the statute is as follows:

"(1) A person is guilty of homicide by abuse if, under circumstances manifesting an extreme indifference to human life, the person causes the death of a child or person under sixteen years of age, a developmentally disabled person, or a dependent adult, and the person has previously engaged in a pattern or practice of assault or torture of said child, person under sixteen years of age, developmentally disabled person, or dependent person.

"(2) As used in this section, "dependent adult" means a person who, because of physical or mental disability, or because of extreme advanced age, is dependent upon another person to provide the basic necessities of life.

"(3) Homicide by abuse is a class A felony." RCW 9A.32.055.

UNCONSTITUTIONAL VAGUENESS

██ Russell argues that the statutory phrase "pattern or practice of assault or torture" is unconstitutionally vague under the due process clauses of the Fourteenth Amendment and Const. art. 1, § 3.

Although the statute does not define those words, we look to existing law, ordinary usage, and the general purpose of the statute and conclude that the statute meets constitutional requirements of clarity.

██ ██ A statute is presumed constitutional; a challenger must prove the statute vague beyond a reasonable doubt. *State v. Coria*, 120 Wn.2d 156, 163, 839 P.2d 890 (1992). A vagueness challenge to a statute not involving First Amendment rights is evaluated as applied, using the facts of the particular case. *Coria*, 120 Wn.2d at 163; *Spokane v. Douglass*, 115 Wn.2d 171, 182, 795 P.2d 693 (1990). The challenged law "is tested for unconstitutional vagueness by inspecting the actual conduct of the party who challenges the ordinance and not by examining hypothetical situations at the periphery of the ordinance's scope." *Douglass*, 115 Wn.2d at 182-83. The *alleged* conduct of the challenger may be used. *See Douglass*, 115 Wn.2d at 183.

██ The Fourteenth Amendment due process clause requires that citizens be afforded fair warning of proscribed conduct. *Spokane v. Douglass*, 115 Wn.2d at 178. A statute is unconstitutionally vague if either: "(1) . . . [it] does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed, or (2) . . . [it] does not provide ascertainable standards of guilt to protect against arbitrary enforcement." *Douglass*, 115 Wn.2d at 178.

██ Although a statute is insufficiently definite if persons of common intelligence must guess at the meaning of the statute and may differ as to its application, some imprecision or uncertainty is constitutionally permissible. *Douglass*, 115 Wn.2d at 179. We consider the context of the entire enactment, not just the challenged words. *Douglass*, 115 Wn.2d at 180. The Legislature may use ordinary terms adequately interpreted in common usage and understand-

ing; in addition, words defined elsewhere in statutory or case law retain their meanings when used without definition in a new law. *Douglass*, 115 Wn.2d at 180 & n.5.

■ The other due process requirement, "ascertainable standards of guilt", is violated if a statute lacks minimal standards or if it uses terms that are inherently subjective in the context in which they are used. *Douglass*, 115 Wn.2d at 180 n.6. Minimal standards protect against arbitrary, erratic and discriminatory enforcement. 115 Wn.2d at 180. However, a statute violates the Fourteenth Amendment "only if it invites an inordinate amount" of law enforcement discretion. *Douglass*, 115 Wn.2d at 181.

Thus, we review the phrase "pattern or practice of assault or torture" in the context of the homicide by abuse statute and as applied to Russell's conduct. At trial, the prosecution produced evidence that Russell was responsible for the following predeath injuries to Derik: a broken clavicle (before 3 months of age); a skull fracture and resulting subdural hematomas (between 1 and 3 months of age); a later head injury resulting in new subdural hematomas, retinal bleeding, and brain damage (at 4 months of age); and a bloody nose, bruised neck, and head rash (at 12 months of age).

■ The term "assault" is defined in the common law and requires unlawful force. *Pasco v. Ross*, 39 Wn. App. 480, 483, 694 P.2d 37 (1985); *accord, State v. Krup*, 36 Wn. App. 454, 457, 676 P.2d 507, *review denied*, 101 Wn.2d 1008 (1984). Assault can be committed in three different ways: "(1) an attempt, with unlawful force, to inflict bodily injury upon another [attempted battery]; (2) an unlawful touching with criminal intent [battery];[4] and (3) putting another in apprehension of harm whether or not the actor actually intends to

---

[4] As Derik's parent, Russell was permitted to intentionally touch or strike Derik; such action was not unlawful unless the force used to commit the battery was unreasonable or immoderate under RCW 9A.16.100. *See State v. Brown*, 60 Wn. App. 60, 73-74, 802 P.2d 803 (1990), *review denied*, 116 Wn.2d 1025 (1991), *disapproved on other grounds in State v. Grewe*, 117 Wn.2d 211, 219-20, 813 P.2d 1238 (1991) and *State v. Chadderton*, 119 Wn.2d 390, 398, 832 P.2d 481 (1992). The jury was so instructed.

inflict or is incapable of inflicting that harm." *State v. Hupe*, 50 Wn. App. 277, 282, 748 P.2d 263, *review denied*, 110 Wn.2d 1019 (1988); *Krup*, 36 Wn. App. at 457-61; WPIC 35.50. All three alternatives require an intentional act. *State v. Mathews*, 60 Wn. App. 761, 766-67, 807 P.2d 890 (1991), *review denied*, 118 Wn.2d 1030 (1992).

Russell contends that the foregoing definitions of "assault" encompass more conduct than persons of common intelligence might expect after reading the homicide by abuse statute. However, in this case, it is clear that assaults resulting in bruises, bleeding, broken bones, and hematomas are included in the statute.

The term "torture" also may be commonly understood and "provides notice, with a reasonable degree of certainty, of what conduct is forbidden." *State v. Brown*, 60 Wn. App. 60, 66, 802 P.2d 803 (1990) (see subsequent history in footnote 4). In addition, the statutory phrase "assault or torture" is phrased in the disjunctive; a pattern or practice of either assault *or* torture violates the statute. Where, as here, the defendant's conduct clearly constituted an assault, the State need not also prove torture.

Furthermore, the terms "pattern" and "practice" have common meanings. "Pattern" is defined as "a regular, mainly unvarying way of acting or doing [behavior *patterns*]," and "practice" is defined as "a frequent or usual action; habit; usage." *Webster's New World Dictionary* 1042, 1117 (1976). Again, we need not determine precise and final meanings for these terms in all possible cases. Four or five assaults over the 8 to 9 nonconsecutive months that Russell had access to Derik clearly constitute a "pattern or practice".

The homicide by abuse statute also satisfies the second prong of the vagueness test: it sets ascertainable and adequate standards of guilt. Russell suggests that the statutory language would permit the State to file charges based on a pattern or practice of *simple* assaults, and that this would constitute arbitrary enforcement.[5] We disagree. First,

---

[5]Russell makes this argument as an equal protection claim, but it is properly analyzed as a vagueness challenge. We note, however, that prosecutorial discretion to choose between even identical statutes with differing punishments does

the statute does not specify any particular degree of assault. Second, assault on one's child, the conduct alleged of Russell, requires proof of unreasonable or immoderate force,[6] and the jury was so instructed. Third, Russell engaged in assaults that caused serious injury. As applied here, the statute provided adequate guidelines to protect against arbitrary or improperly subjective enforcement.

 Finally, Russell suggests that the vagueness of the statute violates the Sixth Amendment and Const. art. 1, § 22 (amend. 10) by not adequately informing a defendant of the nature of the accusation against him. He argues that he could not adequately prepare his defense, apparently because the information did not specify which acts on which dates made up the alleged "pattern or practice of assault or torture". Russell's remedy was to seek a bill of particulars; we will not consider this challenge on appeal. *See State v. Leach*, 113 Wn.2d 679, 687, 782 P.2d 552 (1989).

We believe that persons of common intelligence would understand Russell's conduct to constitute a "pattern or practice of assault or torture". We further believe that the statute provided adequate guidelines to prevent subjective enforcement; its application is not arbitrary in this case. Thus, the statute is not unconstitutionally vague, as applied.

### UNANIMITY

The trial court instructed the jury that to convict Russell of homicide by abuse, it must agree unanimously that Russell had previously engaged in a pattern or practice of assault or torture. However, the trial court did not tell the jury that it had to designate or agree unanimously on the particular cluster of assaultive incidents that constituted the pattern or

---

not deny equal protection. *United States v. Batchelder*, 442 U.S. 114, 124-25, 60 L. Ed. 2d 755, 99 S. Ct. 2198 (1979); *Kennewick v. Fountain*, 116 Wn.2d 189, 192-93, 802 P.2d 1371 (1991). Prosecutorial discretion to choose between statutes with different elements clearly does not deny equal protection. *Fountain*, 116 Wn.2d at 193-94. Prosecutorial choice of homicide by abuse, which requires proof of past assaults, instead of a different homicide statute does not deny equal protection.

[6]*See State v. Brown, supra.*

practice. Russell argues that the absence of such a requirement is reversible error.

In determining the need for a unanimity instruction regarding proof of an underlying element of a crime, we ask three questions. *State v. Hanson*, 59 Wn. App. 651, 656, 800 P.2d 1124 (1990). First, what must be proved under the statute? *Hanson*, 59 Wn. App. at 656. Second, what does the evidence disclose? *Hanson*, 59 Wn. App. at 656-57. Third, does the evidence disclose more than one violation of the statute? *Hanson*, 59 Wn. App. at 657.

(1) The homicide by abuse statute's reference to a "pattern or practice" requires proof of a series of assaultive acts — a continuing course of conduct — not a single incident. (2) The State produced evidence that Derik sustained multiple injuries over a period of time and that Russell inflicted those injuries. (3) This ongoing assaultive conduct constitutes one continuing pattern or practice, and, thus, one violation of the statute.

Under these circumstances, the trial court is not required to give a unanimity instruction. *State v. Elliott*, 114 Wn.2d 6, 13-14, 785 P.2d 440 (a statute prohibiting operation of a prostitution enterprise prohibits a continuing course of conduct; "[a] continuing offense may be charged without specifying individual acts as a basis for the criminal conduct." 114 Wn.2d at 13), *cert. denied*, 498 U.S. 838, 112 L. Ed. 2d 80, 111 S. Ct. 110 (1990). The trial court did not err in failing to give such an instruction because the general verdict necessarily reflected unanimity that Russell engaged in *one* "pattern or practice" of assaultive conduct. *Hanson*, 59 Wn. App. at 657.

EXCEPTIONAL SENTENCE

The standard range sentence for homicide by abuse for someone with Russell's offender score is 250 to 333 months. The trial court imposed an exceptional sentence of 828 months (69 years), identifying five aggravating factors. The court found that (1) Russell employed deliberate cruelty in the method and nature of his assaults on Derik, including the

final, fatal assault; (2) Russell's victim was particularly vulnerable and incapable of resistance due to his very young age; (3) Russell occupied a position of trust as Derik's father; (4) Russell presents a danger to society in the future; and (5) Russell had demonstrated no genuine remorse for his actions.

A sentencing court may impose an exceptional sentence only if it finds, considering the purposes of the Sentencing Reform Act of 1981, RCW 9.94A.010, substantial and compelling reasons justifying an exceptional sentence. RCW 9.94A.120(2). We will reverse an exceptional sentence only if (1) the sentencing court's reasons are not supported by the record, (2) the sentencing court's reasons do not justify an exceptional sentence, or (3) the length of the sentence is clearly excessive. RCW 9.94A.210(4). Russell challenges his sentence on all three grounds.

We review the sentencing court's factual findings under the clearly erroneous standard, reversing only if no substantial evidence supports the findings. *State v. Grewe*, 117 Wn.2d 211, 218, 813 P.2d 1238 (1991). We then determine, as a matter of law, whether factually supported aggravating factors justify an exceptional sentence. *Grewe*, 117 Wn.2d at 215. Our review of legal justification or adequacy employs a 2-part analysis. First, the aggravating factor cannot have been necessarily considered in setting the standard range for the offense. *Grewe*, 117 Wn.2d at 215-16. Second, the "aggravating factor must be sufficiently substantial and compelling to distinguish the crime in question from others in the same category." *Grewe*, 117 Wn.2d at 216. We review whether the length of a sentence is clearly excessive using the abuse of discretion standard. *State v. Stephens*, 116 Wn.2d 238, 245, 803 P.2d 319 (1991).

Russell argues that the sentencing court's finding of lack of remorse is not supported by the record. He argues that the aggravating factors of deliberate cruelty, vulnerability, and position of trust do not justify the sentence. The State concedes the invalidity of the future dangerousness factor. *State v. Barnes*, 117 Wn.2d 701, 703, 713, 818 P.2d 1088

(1991) (pluralities constituting a majority agree that future dangerousness can be used only in sexual offenses).

We have previously held that lack of remorse must be of an aggravated or egregious character to constitute an aggravating factor. *State v. Wood,* 57 Wn. App. 792, 800, 790 P.2d 220, *review denied,* 115 Wn.2d 1015 (1990); *accord, State v. Garibay,* 67 Wn. App. 773, 781, 841 P.2d 49 (1992). Refusing to admit guilt or remaining silent is an exercise of one's rights, not an indication of lack of remorse. *Garibay,* 67 Wn. App. at 782.

As in *Creekmore,* the record in this case contains substantial evidence of Russell's egregious lack of remorse for his assaultive conduct on his son, either before or after the child's death. *See* 55 Wn. App. at 861-62. While Derik was alive, but suffering from injuries inflicted by Russell, Russell sought to prevent the child from receiving medical treatment. On the night of Derik's death, Russell hid the pain-afflicted child in the bedroom, preventing Antonelli from finding or assisting her son. When Derik was taken to the hospital, Russell angrily interfered with medical personnel. After Derik's death, Russell told relatives that he had fooled the police; and Russell insisted on cleaning the apartment where Derik died prior to a scheduled followup visit by the police. Within a few days of Derik's death, Russell was willing "to party". Russell did indicate some remorse at sentencing, but the record supports the court's conclusion that the demonstration lacked credibility and that Russell lacked remorse.

The sentencing court may consider a defendant's knowledge that his victim was particularly vulnerable or incapable of resistance because of extreme youth; such knowledge is identified as an aggravating factor in the Sentencing Reform Act of 1981. RCW 9.94A.390(2)(b). However, Russell argues that the youth of the victim was already considered by the Legislature when it set the standard range for homicide by abuse. The homicide by abuse statute is specifically aimed at the homicide of children. RCW 9A.32.055. However, the vic-

tim's age may be an aggravating factor, even when the statute violated applies only to children, if the victim's extreme youth makes the victim more vulnerable than other victims of the same crime. *State v. Fisher*, 108 Wn.2d 419, 424, 739 P.2d 683 (1987); *Garibay*, 67 Wn. App. at 778-79. The statute encompasses children between the ages of 1 day and 16 years. Looking at that spectrum, Derik, only 20 months old when he died, clearly was particularly vulnerable and incapable of resistance because of extreme youth. Derik's youth was properly considered as an aggravating factor.

█ The sentencing court's third aggravating factor, abuse of a position of trust, refers primarily to the trust relationship between the perpetrator and the victim which renders the victim particularly vulnerable to the crime, and the factor may be used against a parent. *Grewe*, 117 Wn.2d at 220. Russell's parental role gave him unmonitored access to Derik. He abused that position by repeated assaults on the boy until he finally killed him.

Russell argues that all conduct that violates the homicide by abuse statute involves the abuse of a position of trust; therefore, abuse of trust was necessarily considered in setting the standard sentence range. We do not agree that the language of the statute requires abuse of a trust relationship. Admittedly, a person in a position of trust could more easily gain access to a child, an elderly person, or a dependent person. However, this is not a necessary element of the crime. To hold otherwise would mean that a person who committed all the elements of the crime, but was not in a position of trust, could not be convicted of "homicide by abuse". We do not believe this interpretation would be consistent with the legislative intent as expressed in the statute. The sentencing court did not err in relying on this aggravating factor.[7]

█ Finally, the sentencing court pointed to Russell's deliberate cruelty in the commission of the crime as an

---

[7] We note that the *Creekmore* court concluded that extreme youth, abuse of trust, and lack of remorse would be aggravating factors for the crime of homicide by abuse. 55 Wn. App. at 868-69.

aggravating circumstance. This factor is also set forth in the sentencing reform act as an illustrative factor justifying a departure from the standard range. RCW 9.94A.390(2)(a). Deliberate cruelty is gratuitous violence or other conduct, significantly more serious or egregious than typical of the crime, which inflicts physical, psychological or emotional pain as an end in itself. *State v. Strauss*, 54 Wn. App. 408, 418, 773 P.2d 898 (1989); *State v. Delarosa-Flores*, 59 Wn. App. 514, 518, 799 P.2d 736 (1990), *review denied*, 116 Wn.2d 1010 (1991).

Russell contends that any homicide by abuse must necessarily be deliberately cruel because the statute requires a pattern or practice of assault or torture and extreme indifference to human life. We note that the same argument can be made with reference to other criminal statutes, such as murder and intentional rape. However, even where a statute proscribes behavior that generally could be described as deliberately cruel, it remains possible for a defendant to engage in gratuitous violence more egregious than typical.[8] "Deliberate cruelty" does not inhere in homicide by abuse. It is possible to engage in conduct that satisfies the mental element of the crime, extreme indifference to human life, by more passive, less violent means than those used by Russell. One who deliberately and severely beats, with brass knuckles, a 20-month-old child until that child's liver ruptures and the child sustains unusual pain, and who further denies medical assistance to the agonized child, has gone beyond exhibiting extreme indifference to human life; he has engaged in gratuitous violence and deliberate cruelty. Nor does the statute's

---

[8]*E.g., State v. Dunaway*, 109 Wn.2d 207, 219, 743 P.2d 1237, 749 P.2d 160 (1987) (attempted premeditated murder); *State v. Hicks*, 61 Wn. App. 923, 928-29, 812 P.2d 893 (1991) (first degree rape and first degree burglary based on assault); *State v. Campas*, 59 Wn. App. 561, 566, 799 P.2d 744 (1990) (first degree felony murder), *remanded on other grounds*, 118 Wn.2d 1014, 823 P.2d 1068 (1992); *State v. Franklin*, 56 Wn. App. 915, 918-19, 786 P.2d 795 (1989) (attempted premeditated murder), *review denied*, 114 Wn.2d 1004 (1990); *State v. Harmon*, 50 Wn. App. 755, 759-61, 750 P.2d 664 (premeditated murder), *review denied*, 110 Wn.2d 1033 (1988); *State v. Altum*, 47 Wn. App. 495, 503-05, 735 P.2d 1356 (first degree rape and second degree robbery), *review denied*, 108 Wn.2d 1024 (1987).

bare requirement of a previous practice of assault necessarily involve the gratuitously violent head injuries inflicted on Derik before he was 4 months old. Homicide of a child by abuse is indeed an abhorrent crime, but Russell's actions exceeded the prohibited conduct and deserve greater punishment.

Four of the sentencing court's aggravating factors remain valid. Those four are sufficient to justify an exceptional sentence. *See Stephens*, 116 Wn.2d at 245.

We turn now to whether the length of the exceptional sentence imposed is clearly excessive. We will not reverse unless the sentencing court exercised its discretion on untenable grounds or for untenable reasons or unless no reasonable judge would have imposed this sentence. *Stephens*, 116 Wn.2d at 245. The prosecutor recommended a sentence between 60 years and life imprisonment, the statutory maximum. The court was guided by that recommendation and the *Creekmore* sentence of 60 years. These grounds were tenable and we cannot say that no reasonable judge would have imposed the 69-year sentence given Russell. Russell's sentence was not clearly excessive.

We affirm the conviction and sentence.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

ALEXANDER, C.J., and MORGAN, J., concur.

Review denied at 122 Wn.2d 1003 (1993).