66 P.3d 682 (2003)
116 Wash.App. 500
STATE of Washington, Respondent,
v.
Tammy Kay MADARASH, Appellant.
No. 26267-3-II.
Court of Appeals of Washington, Division 2.
April 15, 2003.
*683 Robert W. Huffhines, Kelso, WA, for Appellant.
Alyssa Zach, Deputy Pros. Atty., Kelso, WA, for Respondent.
HOUGHTON, P.J.
Tammy Madarash appeals her convictions of homicide by abuse and second degree felony murder of four-year-old Jennifer Kell, arguing that the evidence was insufficient to support a conviction and that the trial court erred in entering its findings of fact. We affirm the conviction of homicide by abuse but reverse the conviction of second degree felony murder.

*684 FACTS
Jennifer Kell was born on December 1, 1994, to David and Becky Kell. When Jennifer was eleven months old, Becky Kell died from a heart attack. Within a month of Becky's death, David Kell and Madarash, his landlord, were living together. Early in their relationship, Madarash told a friend that Jennifer had "her mother's attitude" and that she was going to "break her of that." 9 Report of Proceedings (RP) at 1084. Jennifer was then barely a year old.
On September 15, 1999, at 6:52 p.m., a Longview paramedic, Jay Jones, responded to a 9-1-1 call from the Kell/Madarash residence. On arrival, he found Jennifer lying on the floor. Jennifer was vomiting heavily and diarrhea was leaking out of her diapers. She told Jones that she "hurt everywhere." 2 RP at 44. Jennifer's condition significantly worsened during the ambulance ride to the hospital. At that point, she began seizing and having difficulty breathing. At the hospital, staff observed an abrasion on the left side of Jennifer's abdomen. Jennifer became comatose, and a CT scan revealed that she had cerebral edema.
Jennifer was transported to a pediatric hospital in Portland for intensive life support. At the hospital, Dr. Joseph Zenel, Jr., a pediatrician, noted several bruises on Jennifer's bodyon her left cheek, on the front of her chest, on her right shoulder, and on the front and back of her knees.
Zenel believed that the bruises were recent because they were evolving as he examined Jennifer. In addition, he believed that the bruises were likely inflicted by grabbing, rubbing, or from blows. He later testified the bruises suggested that Jennifer had struggled and been held down in place. Zenel also testified that the CT scan revealed "tremendous swelling of the brain to the point of almost obliterating the normal spaces that you find in the brain." 4 RP at 423. He concluded that Jennifer most likely experienced a drowning episode, very acute water intoxication, or water ingestion.
Caroline Dodge, an intensive care pediatric nurse, assumed Jennifer's bedside care the morning of September 16. Dodge later testified that she suspected that Jennifer was a victim of abuse and that she saw several bruises develop on Jennifer's body throughout the day. That evening, Jennifer was taken off life support. Fifteen minutes later, Jennifer was dead.
After three interviews with Madarash, Kelso police arrested her on September 17. Madarash told the officers several versions of what had happened to Jennifer. Her final account was that late in the afternoon on September 15, Jennifer had taken a sip of Madarash's Diet Pepsi without permission. As punishment, Madarash forced Jennifer to drink a 48-ounce Diet Pepsi within a matter of minutes. After drinking the Diet Pepsi, Madarash told police Jennifer "burped up something ... or vomited on herself." 11 RP at 1376.
Madarash then pushed Jennifer, fully clothed, into a cold bath. She began throwing cups of cold water in Jennifer's face, throwing them forcefully and continually, into her mouth and onto her face. Jennifer began coughing, crying, and pleading with Madarash to stop. Madarash told police that she said she "didn't care if Jennifer didn't like it" because she "wasn't going to stop." 11 RP at 1379. Jennifer put her hands in front of her face to block the water, and Madarash ordered Jennifer to put her hands down. Madarash continued to throw cups of water in Jennifer's face and open mouth for five to ten minutes.
Madarash also told police that because Jennifer began trying to climb out of the bathtub, she "grabbed Jennifer by the arm and pulled her down under the water ... face down in the tub." 11 RP at 1380. Madarash could not remember how long Jennifer was underwater. Jennifer again tried to climb out of the bathtub and slipped back underneath the water for two or three more seconds. Each time Jennifer tried to get out of the bathtub, Madarash threw cups of water in her face and mouth.
Madarash told detectives that when she finally allowed Jennifer to get out of the bathtub, she could tell that something was wrong because Jennifer was wheezing and *685 had a rattling in her chest. Later that evening, Jennifer collapsed.
Kevin Wolfe, a friend of David Kell, saw Madarash at the hospital. Wolfe later testified that while at the hospital, Madarash told him that Jennifer had stopped breathing and was dead. Wolfe then testified that Madarash lifted up her hair, said, "[S]ee, she threw up in my hair," chuckled, and put her hair back down. 2 RP at 173.
By amended information, the State charged Madarash with homicide by abuse under RCW 9A.32.055 and second degree felony murder under RCW 9A.36.031(1)(d) and/or (f). The predicate felony was third degree assault.
At a bench trial, numerous witnesses testified about Madarash's abusive treatment of Jennifer, giving the following examples:
(1) Madarash beat Jennifer with a wooden spoon, belt, spatula, or willow switch. Many times witnesses saw scratches, bruises, red marks, and welts on Jennifer's face, arms, legs, and bottom. Several times Madarash abruptly jerked Jennifer by the arm and kicked her in the head, causing her to cry. Madarash also violently shook Jennifer, dragged her across a room by her hair, and burned her arm with a cigarette.
In addition, Madarash kneed Jennifer in the back with so much force that Jennifer bent over. Witnesses also saw Madarash tie Jennifer to her bed, hit her with a hanger, and throw her several feet across a room. As a result of this treatment, Jennifer was very frightened of Madarash. When Jennifer did express love to Madarash, Madarash would tell her, "I don't love you.... You're a bitch." 6 RP at 769.
(2) Madarash forced Jennifer to stand in the corner, often in exaggerated and exhausting positions, for up to days at a time. If she fell asleep or cried, Madarash would slap her or throw cold water in her face.
(3) Madarash padlocked Jennifer in her room as punishment. When Jennifer asked to be let out to use the bathroom, Madarash often refused. Jennifer would then soil her panties, and Madarash would punish her for soiling herself. Madarash also made Jennifer wear her soiled panties on her head or around her neck, causing Jennifer to cry.
(4) Madarash frequently put Jennifer into a cold bath, often fully clothed, and showered her with cold water. Jennifer became terrified of water and would cry and plead with Madarash to stop. Afterward, Jennifer was sometimes forced to stand shivering in the corner in her wet clothes. When other children threw water in her face while playing, Jennifer would start crying and screaming.
(5) Madarash force-fed Jennifer after she was full by cramming food down her throat, so that Jennifer would gag or throw up. One witness saw Madarash force-feed boiling hot soup to Jennifer, causing her to scream, cry, and yell, "[M]ommy, too hot." 8 RP at 991. Other times Madarash did not let Jennifer eat anything. In addition, Jennifer would have to drink water out of the toilet because Madarash would not give her anything to drink.
(6) A friend killed an elk on a hunting trip, and Jennifer was very frightened of the elk head. Madarash would force Jennifer to stand by the elk head and look at it, causing Jennifer to scream and cry. Madarash would also tell Jennifer that the elk head was "going to get her." 6 RP at 764.
(7) Madarash often made Jennifer stay in the car in hot weather with the windows closed, sometimes covered with blankets, when the family visited friends or relatives. On car trips, Madarash would make Jennifer stand up in the car while the car was in motion. Jennifer was also put into her crib with several blankets over her in the summer. When she became older, Jennifer was the only member of the household without a bed, and she slept on the floor.
(8) Several times, Madarash taped Jennifer's hands, feet, and mouth with duct tape to restrain her, and then left her in a dark closet. Several other times, Madarash placed Jennifer in a bed sheet, hung the sheet from a door at least three feet in the air, and spanked her.
Dr. Nicholas Hartshorne, Oregon Deputy State Medical Examiner, also testified at trial. Hartshorne conducted the autopsy of Jennifer's remains. Hartshorne identified *686 five or six unusual bruises on Jennifer's body, consistent with being inflicted, and concluded that the cause of Jennifer's death was forced water intoxication. He explained that Jennifer had taken in an extraordinary amount of water and that, as a result, her sodium blood level fell to a fatal level. Her brain then became massively swollen, causing seizures, a lack of oxygen to her brain, and eventually her death. He also concluded that Jennifer's death was a homicide because she had ingested much more water than a child is capable of consuming voluntarily.[1]
At the conclusion of trial, the court gave its oral ruling, later reduced to written findings of fact and conclusions of law. In its oral ruling, the court noted that based on the testimony, every possible cause of death could be ruled out except forced water intoxication. In its findings of fact and conclusions of law, the court found that the cause of Jennifer's death was forced water intoxication. Finding of Fact 9. In addition, the court found, with few exceptions, every witness credible.[2] The court also noted that Madarash's statements to police were consistent with the physical and forensic evidence. The trial court concluded, beyond a reasonable doubt, that by forcing Jennifer to rapidly drink a 48-ounce Diet Pepsi and repeatedly throwing water in Jennifer's face and forcing her underwater in the bathtub, Madarash caused Jennifer's death.

Sufficiency of the Evidence
Madarash first contends that there is insufficient evidence to support her conviction of homicide by abuse. In addition, she asserts that substantial evidence does not support the trial court's findings of fact 2, 4, 10, 12, 13, 15, 16, 17, 23, 24, 27, 28, 29, 30, 31, and 32.[3]
*687 Sufficient evidence supports a conviction if any rational trier of fact could find each element of the crimes charged beyond a reasonable doubt. State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992). We draw all reasonable inferences from the evidence in the light most favorable to the State. State v. Rempel, 114 Wash.2d 77, 82, 785 P.2d 1134 (1990). We leave credibility questions to the trier of fact and we will not overturn them on appeal. State v. Boot, 89 Wash.App. 780, 791, 950 P.2d 964 (citing State v. Tocki, 32 Wash.App. 457, 461, 648 P.2d 99, review denied, 98 Wash.2d 1004 (1982)), review denied, 135 Wn.2d 1015, 960 P.2d 939 (1998). Especially important here, a defendant claiming insufficiency of the evidence admits the truth of the State's evidence and all reasonable inferences from it. Salinas, 119 Wash.2d at 201, 829 P.2d 1068.
We determine whether substantial evidence supports a trial court's challenged findings of fact and, in turn, whether they support the conclusions of law. State v. Broadaway, 133 Wash.2d 118, 131, 942 P.2d 363 (1997). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding. State v. Mendez, 137 Wash.2d 208, 214, 970 P.2d 722 (1999). We treat unchallenged findings of fact as verities on appeal. Robel v. Roundup Corp., 148 Wash.2d 35, 42-43, 59 P.3d 611 (2002) Finally, we review challenges to a trial court's conclusions of law de novo. Robel, 148 Wash.2d at 42-43, 59 P.3d 611.
Here, Madarash's claim that substantial evidence does not support the trial court's findings of fact fails because in claiming insufficiency of the evidence, Madarash admits the truth of the State's evidence. See Salinas, 119 Wash.2d at 201, 829 P.2d 1068. Nevertheless, in the interests of justice, as noted below, we hold that substantial evidence supports each of the trial court's findings of fact.
Dr. Zenel's and Dr. Hartshorne's testimony that Jennifer had seizures, suffered, and died as a result of forced water intoxication from being forced to drink a 48-ounce Diet Pepsi and having water thrown in her face supports findings of fact 2, 12, 13, 15, and 16. Detective Richard Fletcher's testimony that Madarash told police she forced Jennifer to drink a 48-ounce Diet Pepsi supports finding of fact 4. And the testimony of witnesses that Madarash beat Jennifer, leaving bruises and marks; forced her to stand in the corner; severely jerked her by the arm; burned her arm; padlocked her in her bedroom; force-fed her, causing her to gag and choke; and used an elk head to scare her supports findings of fact 23, 24, 27, 28, 29, 30, and 31.[4]

Homicide by Abuse
Madarash asserts that under these unique facts, she could not be convicted of homicide by abuse. More specifically at oral argument, she asserted that because she could not foresee "death by imbibement,"[5] her actions did not meet the elements of homicide by abuse.
Under RCW 9A.32.055(1), a person is guilty of homicide by abuse if "under circumstances manifesting an extreme indifference to human life, the person causes the death of a child ..., and the person has previously engaged in a pattern or practice of abuse of assault or torture of said child." (Emphasis added.)

Extreme Indifference to Human Life
Madarash argues that there is insufficient evidence in the record to support the trial court's finding that she acted with extreme indifference to the life of Jennifer Kell.
*688 Finding of Fact 10. RCW 9A.32.055 does not define "extreme indifference to human life." Madarash urges us to adopt the definition of "extreme indifference" found in the first degree murder statute, RCW 9A.32.030(1)(b). Under that statute, in order to act with extreme indifference to human life, a person must know that his or her behavior creates a grave risk of death to another. RCW 9A.32.030(1)(b).
She further argues that we should adopt a "recklessness" standard in defining "extreme indifference." See State v. Dunbar, 117 Wash.2d 587, 594, 817 P.2d 1360 (1991) (holding that "extreme indifference" requires a showing of recklessness in first degree murder cases). In other words, Madarash contends that in order to have acted with extreme indifference to Jennifer's life, she would have had to understand that her actions would lead to a reduction of Jennifer's sodium levels and that the average person does not have such advanced scientific knowledge. We disagree and decline to adopt a recklessness standard in defining "extreme indifference" for the following reasons.
First, in State v. Edwards, 92 Wash.App. 156, 961 P.2d 969 (1998), Division One held that the definition of "extreme indifference to human life," as it is used in the first degree murder statute, does not apply in homicide by abuse cases. Edwards, 92 Wash.App. at 158, 961 P.2d 969. In the homicide by abuse statute, the phrase "extreme indifference to human life" refers to an indifference to the life of the particular victim, whereas in the first degree murder statute, the phrase refers to an indifference to human life in general. Edwards, 92 Wash.App. at 158, 162-65, 961 P.2d 969.
In Edwards, the court held that using the first degree murder definition of "extreme indifference" would leave the homicide by abuse statute without effect. Edwards, 92 Wash.App. at 163, 961 P.2d 969. The court further noted that although the legislature used the same standard of mens rea, "extreme indifference," for both statutes, it is also noted that when the same words or phrases are used in difference statutes, their meaning depends on common usage and the context in which the words are used. Edwards, 92 Wash.App. at 163, 961 P.2d 969. The first degree murder and homicide by abuse statutes have differing structures and purposes; the legislature intended that these crimes apply to different classes of victims. Edwards, 92 Wash.App. at 164, 961 P.2d 969.
Second, in the homicide by abuse statute, the legislature did not incorporate the language, "conduct which creates a grave risk of death," from the first degree murder statute. RCW 9A.32.030(1)(b). As noted, RCW 9A.32.055 does not define "extreme indifference." When a statute does not define a word, we may rely on the ordinary meaning of the word as it is defined in a dictionary. Budget Rent A Car Corp. v. Dep't of Licensing, 144 Wash.2d 889, 899, 31 P.3d 1174 (2001).
According to Webster's, the word "extreme" means "existing in the highest or the greatest possible degree; very great; very intense." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 807 (1969). The word "indifference" means "the quality or state of being indifferent." WEBSTER'S, supra, at 1151. "Indifferent" means "looked upon as not mattering one way or another," or "regarded as being of no significant importance or value." WEBSTER'S, supra, at 1151.
We decline to adopt Madarash's argument that the first degree murder definition of "extreme indifference" applies here. Therefore, we hold that Madarash did not have to know or understand the physiological response, or any other results, that Jennifer might endure from drinking a 48-ounce Diet Pepsi and ingesting great quantities of water in the bathtub. Rather, in order to have acted with extreme indifference to Jennifer's life, Madarash simply had to not care whether Jennifer lived or died. The evidence in the record supports this conclusion.
After Madarash forced Jennifer to drink the Diet Pepsi, Jennifer threw up on herself. Rather than helping Jennifer, Madarash forced her into a cold bath, began throwing water in her face, and held her face under the water. Evidence of bruises developing on Jennifer after she arrived at the hospital shows that she struggled to escape from the bathtub. Madarash forced her to remain in the bathtub, all the while throwing cups of water in her face. When Jennifer cried and *689 pleaded with Madarash to stop, Madarash told her that she did not care whether Jennifer did not like it and that she was not going to stop.
After Jennifer was taken out of the tub, she was wheezing, throwing up, and had diarrhea. Madarash did not call 9-1-1 dispatch until Jennifer collapsed. At the hospital, Madarash displayed no signs of emotion over Jennifer's death. Instead, she chuckled as she told a friend that Jennifer had vomited in her hair. This evidence overwhelmingly supports the trial court's conclusion that through her actions, Madarash manifested extreme indifference to Jennifer's life.

Pattern or Practice of Assault or Torture
Madarash further contends that insufficient evidence supports the trial court's finding that she engaged in a pattern or practice of assault and torture toward Jennifer.[6] Findings of Fact 17, 32.
We previously defined the assault or torture element of homicide by abuse, using common law and dictionary definitions. State v. Russell, 69 Wash.App. 237, 246-47, 848 P.2d 743, review denied, 122 Wash.2d 1003, 859 P.2d 603 (1993). At common law, an assault could be committed in three ways: "(1) an attempt, with unlawful force, to inflict bodily injury upon another [attempted battery]; (2) an unlawful touching with criminal intent [battery]; and (3) [intentionally] putting another in [reasonable] apprehension of harm, whether or not the actor actually intends to inflict or is incapable of inflicting that harm." Russell, 69 Wash.App. at 246-47, 848 P.2d 743 (footnote omitted) (quoting State v. Hupe, 50 Wash.App. 277, 282, 748 P.2d 263, review denied, 110 Wash.2d 1019 (1988)).
RCW 9A.32.055 does not define "torture." According to Webster's, "torture" means "to cause intense suffering; inflict anguish on; subject to severe pain." WEBSTER'S, supra, at 2414. In addition, the statutory phrase "assault or torture" is phrased in the disjunctive; a pattern or practice of assault or torture violates the homicide by abuse statute. Russell, 69 Wash.App. at 247, 848 P.2d 743.
The word "pattern" is defined as "`a regular, mainly unvarying way of acting or doing [behavior patterns],' and `practice' is defined as `a frequent or usual action; habit; usage.'" Russell, 69 Wash.App. at 247, 848 P.2d 743 (emphasis omitted) (citing WEBSTER'S, supra, at 1042, 1117). See Budget Rent A Car Corp., 144 Wash.2d at 899, 31 P.3d 1174 (holding that where a statute does not define a word courts may rely on the ordinary meaning of the word).
Thus, in order to be convicted of homicide by abuse, Madarash had to regularly or habitually assault or torture Jennifer. The evidence amply supports this conclusion. Findings of Fact 17, 32.
First, the evidence supports the conclusion that Madarash habitually assaulted Jennifer, using unreasonable or immoderate means to "discipline" her. Witnesses testified that Madarash threw Jennifer several feet through the air, kicked her in the head many times, and burned her mouth with boiling hot soup and her arm with a cigarette. Witnesses also testified that Madarash violently shook Jennifer. Madarash interfered with Jennifer's breathing several times when she stuffed food down her throat so that Jennifer would gag or throw up and when she threw water in Jennifer's face.
Numerous witnesses testified that they saw bruises, welts, and scratches on Jennifer's body, and one witness testified that there were always scratches and bruises on *690 Jennifer. Witnesses also saw Madarash knee Jennifer in the back so hard that she bent over, hit her with a hanger, and severely jerk her arm. Witnesses testified that Madarash committed these acts throughout Jennifer's life. The evidence overwhelmingly shows that Madarash engaged in a practice or pattern of assaulting Jennifer.
Furthermore, the evidence supports the conclusion that Madarash habitually tortured Jennifer. Findings of Fact 17, 32. Witnesses testified that Madarash frequently forced Jennifer to take cold baths or showers. Madarash threw cold water in Jennifer's face causing her to become terrified of water. Several times Madarash duct-taped Jennifer's mouth, hands, and legs, and left her in a dark closet.
Witnesses also testified that on numerous occasions Madarash forced Jennifer to stay in a hot car, sometimes covered in blankets, with the windows rolled up. Madarash also left Jennifer in her crib covered in blankets on hot days and tied her to her bed. Madarash regularly forced Jennifer to stand in the corner, in extreme positions and for prolonged periods of time causing Jennifer to cry.
In addition, Madarash often padlocked Jennifer in her room and would not allow Jennifer to go to the bathroom. Then Madarash would make Jennifer wear her urine-soaked or soiled panties over her head, causing Jennifer to cry. Madarash also used an elk head to terrorize Jennifer.
In sum, Jennifer, a child described as "beautiful" and "the best little girl" (6 RP at 745), lived a short life of continual torture, assault, and extreme cruelty. This evidence overwhelmingly supports the trial court's finding of a pattern or practice of assault or torture.

Second Degree Felony Murder
Madarash also contends that there is insufficient evidence to support her conviction of second degree felony murder.
A person is guilty of second degree felony murder when "[h]e [or she] commits or attempts to commit any felony other than those enumerated in RCW 9A.32.030(1)(c), and, in the course of and in furtherance of such crime ..., he [or she] ... causes the death of a person other than one of the participants." RCW 9A.32.050(1)(b). The predicate felony to Madarash's conviction was third degree assault of Jennifer. But as the State correctly agreed at argument on this matter, the recent Supreme Court opinion, In re the Personal Restraint Petition of Andress, 147 Wash.2d 602, 56 P.3d 981 (2002), amended, 147 Wash.2d 602, 56 P.3d 981 (2003) (order denying motion for reconsideration and order changing opinion filed March 14, 2003), controls here. The Andress court held that assault cannot serve as the predicate felony for second degree felony murder. Andress, 147 Wash.2d at 604, 56 P.3d 981. Therefore, Madarash's conviction of second degree felony murder must be reversed.
In summary, we affirm Madarash's conviction of homicide by abuse and reverse her conviction of second degree felony murder.[7]
We concur: BRIDGEWATER and Armstrong, JJ.
NOTES
[1] At the time, four-year-old Jennifer weighed only 33 lbs.
[2] The court found testimony throughout the bench trial by Donna Huckabee, Kevin Wolfe, Julie Pichardo, Judy Wolfe, Norman Kell, Joyce Kell, Charles Housley, Lilly Russell, Katherine Ann Kell, Lester Peck, James Young, Tyson Goldwater, Bernadine Ruth Merritt, James Cashner, Connie Mariscal, T. Elaine Mallis, Audrey Lile, Lisa Jones, Gayle Lewis, Linda Gonzalez, Beverly Ramey, Kelly Anderson, Tara Rooney, Joyce Bisconer, Phillip Kell, and Jimmy Bean generally credible because these witnesses gave long-term, consistent descriptions of Madarash's abusive treatment of Jennifer. The court found testimony by James Young that he saw several cigarette burns on Jennifer "not particularly reliable" (13 RP at 1785) because other witnesses testified that they saw only one burn. Many of these witnesses contacted Child Protective Services several times to report Madarash's treatment of Jennifer.
[3] Finding of Fact 2: On October 11, 1999, Jennifer Kell died as the result of forced water intoxication.

Finding of Fact 4: On October 10, 1999, Defendant forced Jennifer Kell to drink 48-ounces of Diet Pepsi within the time span of a matter of minutes as punishment.
Finding of Fact 10: In forcing Jennifer Kell to ingest 48-ounces of Diet Pepsi, throwing a continuous flow of water into the face of the child, and forcing her under water [sic], Tammy Madarash acted with extreme indifference to human life, specifically the life of Jennifer Kell.
Finding of Fact 12: That forcing Jennifer Kell to ingest 48-ounces of Diet Pepsi, throwing a continuous flow of water in her face and forcing her underwater were assaults likely to produce bodily harm on her.
Finding of Fact 13: Jennifer Kell died as a result of injuries sustained from the Defendant in the course of Assault in the Third Degree.
Finding of Fact 15: Prior to her lapsing into a coma, Jennifer Kell experienced seizures and complained of considerable pain over her entire body.
Finding of Fact 16: These assaults on Jennifer Kell caused bodily harm accompanied by substantial pain for a sufficient period of time to cause considerable suffering.
Finding of fact 17: Over a three and one-half year period of time, from when Jennifer Kell was one year old to when she died, Defendant engaged in a pattern and practice of assault and torture of Jennifer Kell.
Finding of Fact 23: Defendant beat Jennifer Kell using a stick, belt, and wooden spoon, leaving bruises and welts on the body of Jennifer Kell.
Finding of Fact 24: Defendant, on numerous occasions, forced Jennifer Kell to stand in the corner, sometimes all night long, in extreme body stances, arms up and arms out, striking her when she would either try to sit down, or lower her arms.
Finding of Fact 27: Defendant routinely jerked Jennifer by the hair and by her arm to get her to go to places.
Finding of Fact 28: Defendant intentionally burned Jennifer Kell on the arm with a cigarette.
Finding of Fact 29: Defendant padlocked Jennifer Kell in her bedroom for long periods of time.
Finding of Fact 30: Defendant stuffed food in the mouth of Jennifer Kell causing her to gag and choke.
Finding of Fact 31: Defendant used a real elk head to scare and terrorize Jennifer Kell.
Finding of Fact 32: Defendant engaged in a pattern and/or practice of assault and torture of Jennifer Kell for over three years prior to her death.
Clerk's Papers (CP) at 49-51.
[4] We address findings of fact 10, 17, and 32, concerning the sufficiency of the State's evidence in the remainder of this opinion.
[5] Also, at oral argument, defense counsel asserted that in order to act with extreme indifference toward Jennifer's life, Madarash would have had to understand that Jennifer might die from being forced to drink 48-ounces of Diet Pepsi, having cups of water throw into her face, and having her head held underwater.
[6] Madarash further argues that the evidence is insufficient to show that she engaged in a pattern or practice of assault because her "disciplinary" actions were not unreasonable under RCW 9A.16.100. Under that statute, the following actions are presumed unreasonable when used to correct or restrain a child: "(1) Throwing, kicking, burning, or cutting a child; (2) striking a child with a closed fist; (3) shaking a child under age three; (4) interfering with a child's breathing; (5) threatening a child with a deadly weapon; or (6) doing any other act that is likely to cause and which does cause bodily harm greater than transient pain or minor temporary marks. The age, size, and condition of the child and location of the injury shall be considered when determining whether the bodily harm is unreasonable or moderate. The list is illustrative ... and is not intended to be exclusive." RCW 9A.16.100. This issue was not raised below and, thus, may not be raised on appeal. RAP 2.5(a). Nevertheless, substantial evidence supports the trial court's oral decision that Madarash's actions were unreasonable under RCW 9A.16.100.
[7] Because Madarash's sentences for homicide by abuse and second degree felony murder merged for sentencing purposes, it is unnecessary to remand for resentencing. CP at 54.