# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71193-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CARRI DARLENE WILLIAMS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: December 21, 2015 |
| | ) | |

VERELLEN, A.C.J. — After a seven-week jury trial, Carri Williams was convicted of homicide by abuse for the death of her adopted daughter H.W. and first degree assault of a child as to her adopted son I.W.[1] H.W. died from hypothermia after the young girl spent approximately nine hours outside with inadequate clothing in rainy, cold weather.

Carri's assignments of error on appeal all lack merit. Sufficient evidence supports the element that H.W. was under 16 years of age when she died, and that I.W. suffered substantial bodily harm as a result of beatings by Carri; the exclusion of a late-disclosed defense expert's testimony on the age of H.W. and the admission of the State's experts' testimony on torture were within the trial court's discretion; it was within the trial court's discretion to strike testimony rather than grant a mistrial when the prosecutor failed to timely disclose amenities it had provided to a witness; prompt curative instructions adequately addressed any prosecutorial misconduct in closing

---

[1] Carri Williams and her husband Larry Williams were tried together. For ease of reference, we refer to them by their first names.

argument; the statutory elements of homicide by abuse and first degree assault of a child are not unconstitutionally vague; and the public trial right is not implicated by taking peremptory juror challenges on paper.

We affirm Carri's convictions for homicide by abuse and first degree assault of a child.

## FACTS

Carri and Larry married in 1990. They have seven biological children. In August 2008, they adopted two children from Ethiopia, H.W. and I.W., who is deaf.

Larry worked swing shift at his job, leaving home at noon and returning around midnight. Larry cooked the children breakfast every morning before work. He was frequently home on weekends. Carri, fluent in sign language, raised and home schooled the children and made them do chores around the house. She also made the children do "boot camp," a form of punishment consisting of extra chores both inside and outside the house.[2]

When H.W. first arrived at the Williamses' home, she behaved and integrated well. After the first year, she occasionally disobeyed the Williamses, such as taking food without permission. As a result, H.W. was not allowed to participate in some holiday activities and family events. When I.W. first arrived at the Williamses' home, he acted out aggressively and also occasionally disobeyed the Williamses.

Both Carri and Larry disciplined their children. The Williamses punished I.W. and H.W. more than the other children, and their punishments increased in "severity" and

---

[2] Report of Proceedings (RP) (Aug. 5, 2013) at 55.

"frequency" over time.[3] Punishment included spankings with a belt, a wooden stick, or a glue stick and being hosed down with cold water outside. The Williamses spanked I.W. all over his body.

The Williamses used food deprivation as punishment. They served cold food and leftovers, frozen vegetables, and sandwiches soaked in water to I.W. and H.W. but not the other children. They forced H.W. and I.W. to eat some of their meals outside in "any kind of weather."[4] During the last six months of her life, H.W. ate breakfast and other meals outside "more times than not."[5] Sometimes, when H.W. was placed outside, she would not come back inside "even though she was allowed back inside."[6] The Williamses occasionally "didn't let her into the house to warm up."[7]

The Williamses used isolation as punishment. At times, the Williamses forced H.W. to stay and sleep alone in the barn outside without electricity and to take cold showers outside. Other times, the Williamses forced H.W. to stay and sleep alone in a shower room. H.W. would generally stay outside "for long periods of time."[8] Beginning in late 2010 and up until her death, the Williamses forced H.W. to stay and sleep alone in a closet at "night and during the day sometimes."[9] The closet measured "two foot by four foot three inches."[10] H.W. "wasn't able to stretch" or "change her position

---

[3] RP (Aug. 27, 2013) at 32.

[4] RP (Aug. 1, 2013) at 26.

[5] RP (Aug. 27, 2013) at 103.

[6] Id. at 135.

[7] RP (Aug. 1, 2013) at 20.

[8] RP (Aug. 20, 2013) at 50.

[9] RP (Aug. 5, 2013) at 49.

[10] RP (Aug. 7, 2013) at 127.

3

significantly" inside it.[11]  None of the other children were forced to sleep in the closet. The closet door was locked from the outside.

The Williamses used humiliation as punishment. When I.W. wet himself, the Williamses would hose him down with cold water and force him to sleep in the shower room. When he wet the bed, the Williamses would give him cold showers. H.W. had Hepatitis B. When she started menstruating, H.W. would smear "her menstrual blood on bathroom surfaces."[12]  Concerned that their other children would contract Hepatitis B, the Williamses purchased a port-a-potty, placed it outside, and frequently forced H.W. to use it. Carri also shaved off H.W.'s hair multiple times.

In Ethiopia, H.W. was "a healthy size and stature" for her age.[13]  "There was no evidence of malnutrition."[14]  When she first arrived at the Williamses' home, H.W. "had fairly normal height and weight."[15]  During the first two years, H.W.'s weight increased steadily and overall "she was generally healthy."[16]  Her body weight was in the "90th percentile" of the body mass index chart (BMI), which is considered "overweight."[17]  By 2011, H.W.'s weight dropped from 110 pounds to around 80 pounds. When H.W. died, her weight was in the "third percentile" of the BMI.[18]

---

[11] RP (Aug. 2, 2013) at 28.

[12] RP (Aug. 28, 2013) at 131.

[13] RP (Aug. 13, 2013) at 87.

[14] Id. at 98.

[15] RP (July 29, 2013) at 70.

[16] Id.

[17] Id. at 130.

[18] Id. at 75.

On May 11, 2011, Larry left for work as usual around noon. Carri sent H.W. outside around 3:00 p.m. Initially, H.W. wore sweatpants and a long-sleeve shirt. The temperature was "in the mid- to upper fifties."[19] It started to rain later that evening, and the temperature became "cold."[20] Carri told H.W. to do exercises to keep warm. Carri told H.W. multiple times to come inside, but she refused. Carri told one of her daughters to check on H.W. every 10 or 15 minutes. Carri placed dry clothes outside for H.W. because the rain had soaked her clothes.

Around 8:30 p.m., Carri told H.W. to go to the port-a-potty. H.W. "took about ten or twenty steps, and she began throwing herself down" on her hands and knees.[21] H.W. repeated this behavior all the way to the port-a-potty. H.W. did the same thing on the way back to the house, hitting her forehead on the concrete patio several times. H.W. continued to "throw herself around" for "twenty or thirty minutes."[22] Carri observed that H.W. "had skinned up her knees and her elbows quite a bit" and "had a knot on her forehead."[23] Each time that one of Carri's daughters looked outside to check on H.W., H.W. had removed pieces of clothing until she was naked.[24]

Shortly before midnight, one of Carri's daughters saw H.W. lying naked face down in the grass. Carri went to check on H.W. She tried to carry H.W. inside, but H.W. was too heavy. Carri grabbed a sheet to cover H.W.'s naked body. Carri's sons

---

[19] RP (Aug. 30, 2013) at 92.

[20] RP (Aug. 6, 2013) at 96.

[21] RP (Aug. 28, 2013) at 166.

[22] Id. at 167.

[23] Id. at 168.

[24] The false sensation of warmth and removal of clothing, called "paradoxical undressing," is common to hypothermia. RP (July 30, 2013) at 81.

helped carry H.W. inside. Carri did not feel a pulse. She performed cardiopulmonary resuscitation (CPR), called Larry, and then called 911. Larry arrived and helped perform CPR before medics arrived. H.W. died at the hospital at 1:30 a.m.

A jury convicted Carri of homicide by abuse, first degree manslaughter, and first degree assault of a child. At sentencing, the court vacated the manslaughter conviction on double jeopardy grounds.

Carri appeals.

## ANALYSIS

### Sufficiency of the Evidence

Carri challenges the sufficiency of the evidence for both of her convictions. Evidence is sufficient to support a conviction if any rational trier of fact could have found the crime's essential elements beyond a reasonable doubt.[25] We view the evidence and all reasonable inferences from the evidence in the light most favorable to the State.[26]

Carri contends insufficient evidence supports that H.W. was under 16 years of age. A conviction for homicide by abuse, as charged here, requires that a person "causes the death of a child or person under sixteen years of age."[27] The jury heard conflicting testimony from many experts about H.W.'s age. For example, Dr. Gary Bell, a forensic dentist, testified that Hana was "at least 15 years old, but she could be

---

[25] State v. Condon, 182 Wn.2d 307, 314, 343 P.3d 357 (2015) (quoting State v. Luvene, 127 Wn.2d 690, 712, 903 P.2d 960 (1995)).

[26] State v. Ozuna, 184 Wn.2d 238, 359 P.3d 739, 744 (2015).

[27] RCW 9A.32.055(1).

anywhere from 13 to 18."[28] Dr. David Sweet, a forensic dentist, testified that H.W. was "16.25 years of age, . . . plus or minus . . . 1.5 years."[29] Katherine Taylor, a forensic anthropologist, testified that H.W. was between "13 to 17 years of age" and "right around 15 years of age."[30] Dr. Jordan Haber, a radiologist, testified that H.W. was "between 15 and 17 years old."[31]

Dr. Carolyn Roesler, a general medical practitioner in Australia, met H.W. in December 2007 while volunteering in Ethiopia and last saw her in 2008. Dr. Roesler observed H.W. on several occasions. She diagnosed and treated H.W. for abdominal discomfort and an eye infection. Dr. Roesler also observed H.W. exiting the shower once and saw no signs of breast development or pubic hair. Based upon her observations, Dr. Roesler concluded H.W.'s "age was between ten and eleven years old" when she saw H.W. in 2008.[32] This would have made H.W. 13 or 14 years old at the time of her death. Dr. Roesler's testimony is sufficient evidence to support the element that H.W. was under 16 years of age at the time of her death.

Carri contends insufficient evidence supports that I.W. suffered substantial bodily harm. A conviction for first degree assault of a child, as charged here, requires that a person intentionally assaults a child and causes substantial bodily harm.[33] "Substantial bodily harm" means "bodily injury which involves a temporary but substantial

---

[28] RP (Aug. 9, 2013) at 32.

[29] RP (Aug. 22, 2013) at 45, 46.

[30] RP (Aug. 23, 2013) at 54.

[31] RP (Aug. 29, 2013) at 24.

[32] RP (Aug. 13, 2013) at 116.

[33] RCW 9A.36.120(1)(b)(ii).

disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ."[34]

I.W. had a scar under his arm that he showed to the jury. He testified that he did not have any scars when he arrived at the Williamses' home and that Carri caused the scar under his arm. The family's physician Dr. Harold Clark testified that he never saw any marks or scars on I.W.'s body during his initial examinations in 2008. This testimony is sufficient evidence that the scar on I.W.'s body was caused by Carri and resulted in a temporary but substantial disfigurement.

We conclude sufficient evidence supports Carri's convictions for homicide by abuse and first degree assault of a child.

### Exclusion of Dr. Eric Bartelink's Testimony

Carri contends the trial court abused its discretion when it excluded Dr. Eric Bartelink's testimony as a discovery sanction. We disagree.

We review a trial court's decision to exclude evidence for abuse of discretion.[35] A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds or untenable reasons.[36]

CrR 4.7 governs discovery in criminal cases and "defines the discovery obligations of both the prosecution and defense."[37] A defendant has "a continuing obligation"[38] to promptly disclose the names and addresses of intended witnesses and

---

[34] RCW 9A.04.110(4)(b).

[35] State v. Franklin, 180 Wn.2d 371, 377 n.2, 325 P.3d 159 (2014).

[36] State v. Neal, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001) (quoting State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997)).

[37] State v. Linden, 89 Wn. App. 184, 190, 947 P.2d 1284 (1997).

[38] Id.

the substance of their testimony "no later than the omnibus hearing."[39] To enforce CrR 4.7, a trial court is given "wide discretion in ruling on discovery violations."[40] CrR 4.7(h)(7) lists sanctions for a party's failure to comply with any discovery rule. The trial court may "grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances."[41] Our Supreme Court in State v. Hutchinson interpreted CrR 4.7(h)(7) to permit "exclusion of defense witness testimony as a sanction for discovery violations."[42] But exclusion of evidence is "an extraordinary remedy" that "should be applied narrowly."[43]

The Hutchinson court identified four factors that a trial court should consider in determining whether to exclude evidence as a discovery sanction: "(1) the effectiveness of less severe sanctions; (2) the impact of witness preclusion on the evidence at trial and the outcome of the case; (3) the extent to which the prosecution will be surprised or prejudiced by the witness's testimony; and (4) whether the violation was willful or in bad faith."[44] Although the trial court here did not expressly apply the four factors in excluding Dr. Bartelink's testimony, the State and the defense briefed those factors at trial. The lack of express findings regarding the four factors does not preclude us from evaluating those factors based on the record developed at trial.[45]

---

[39] CrR 4.7(b)(1).

[40] Linden, 89 Wn. App. at 189-90.

[41] CrR 4.7(h)(7)(i).

[42] 135 Wn.2d 863, 881, 959 P.2d 1061 (1998) (relying on the "deems just" language in CrR 4.7(h)(7)(i)).

[43] Id. at 882.

[44] Id. at 883.

[45] See State v. Venegas, 155 Wn. App. 507, 521-22, 228 P.3d 813 (2010).

Many months before trial, the parties knew that H.W.'s age was a contested issue. The parties discussed the potential for various tests to estimate H.W.'s age, including the use of radiocarbon dating of teeth. In January 2013, six months before trial, the trial court authorized Dr. Bartelink to assess H.W.'s teeth in order to estimate her age. It appears Larry listed Dr. Bartelink as a potential witness but then removed him from the witness list. Mid-trial, after the State disclosed that H.W.'s cousin would travel from Ethiopia to testify to H.W.'s birth date, Larry asked Dr. Bartelink to arrange for radiocarbon dating of H.W.'s teeth. When Larry received the results of those tests and Dr. Bartelink's report, he advised the State and asked the court to supplement the witness list.

The trial court initially permitted Dr. Bartelink to testify despite the late disclosure. The court focused upon the defense's reasonable need to respond to the cousin's testimony of a specific birth date and upon counsel's representation that Dr. Bartelink would conclude it was scientifically impossible for H.W. to be 13 or 14 years of age at the time of her death. But once the court struck the cousin's testimony, the court granted the State's motion to exclude Dr. Bartelink's testimony as a discovery sanction for late disclosure. The court determined that the defense no longer needed to rebut the cousin's testimony and that Dr. Bartelink's testimony would not exclude H.W. from being under 16 years of age.

The issue here is whether excluding Dr. Bartelink's testimony was the proper remedy under the circumstances.

Less severe sanctions. A party's failure to identify witnesses in a timely manner is "appropriately remedied by continuing trial to give the nonviolating party time to

interview a new witness or prepare to address new evidence."[46] The defense disclosed Dr. Bartelink as a witness mid-trial, but the State knew about Dr. Bartelink's testing methods as early as December 2012. The State objected that there was inadequate time to prepare to interview and cross-examine Dr. Bartelink on the technical area of radiocarbon dating of teeth. Although it is not clear from the record why a continuance was an inadequate remedy, the trial court is best situated to analyze the extent of the delay that would be required to adequately prepare to cross-examine Dr. Bartelink. At most, this factor mildly weighs against exclusion.

Impact of witness preclusion. The impact of precluding Dr. Bartelink's testimony that H.W. was 15 years of age or older was not significant and did not undermine Carri's defense. Dr. Bartelink alone used the radiocarbon testing method when he estimated with "95% confidence" H.W.'s "minimum age at death to be 15.6 years.[47] But his ultimate conclusion that H.W. was between 15 and 20 years of age is cumulative to the age ranges testified to by the other experts at trial. When the trial court excluded Dr. Bartelink's testimony, it had already struck H.W.'s cousin's testimony that H.W. was born on a specific date and had instructed the jury to disregard the cousin's testimony. The defense no longer needed to rebut that testimony. This factor weighs in favor of exclusion.

Surprise or prejudice. The State knew about the potential for radiocarbon testing in January 2013, six months before trial, when Dr. Bartelink received the teeth. The State did not know the results of the testing until mid-trial, but the State was able to

---

[46] Hutchinson, 135 Wn.2d at 881.

[47] Clerk's Papers (CP) at 265.

interview Dr. Bartelink shortly after receiving his report. Although the trial court is best situated to evaluate the level of surprise or prejudice from the late disclosure of a witness, the extent of any surprise to the State here was limited.

Willfulness and bad faith. Larry did not seek to conduct radiocarbon testing of H.W.'s teeth until several months after Dr. Bartelink received them. That delay was intentional and not inadvertent or the result of miscommunication. Carri did not disclose Dr. Bartelink as a potential witness until the August 13, 2013 hearing and never supplemented her witness list to include Dr. Bartelink. Her decision not to list Dr. Bartelink as a witness was also intentional conduct. This factor weighs in favor of exclusion.

On this record, with at most two factors supporting exclusion and two factors opposing exclusion, we conclude the trial court acted within its wide discretion in excluding Dr. Bartelink's testimony.

### Denial of Defense Counsel's Motion for Mistrial

Carri contends the trial court abused its discretion in denying her motion for mistrial based on the State's misconduct involving H.W.'s cousin Tenassay Wondetsaddik. We disagree.

We review a trial court's denial of a motion for mistrial for abuse of discretion.[48] A trial court abuses its discretion in denying a motion for a mistrial only if its decision is manifestly unreasonable or based on untenable grounds.[49] To determine whether a trial irregularity warrants a new trial, we examine the seriousness of the irregularity, whether

---

[48] State v. Rodriguez, 146 Wn.2d 260, 269, 45 P.3d 541 (2002).

[49] State v. Allen, 159 Wn.2d 1, 10, 147 P.3d 581 (2006) (quoting Stenson, 132 Wn.2d at 701).

the testimony was cumulative, and whether the irregularity could be cured by a limiting instruction.[50]

Wondetsaddik testified that he was present at H.W.'s birth, lived with H.W. for five or six years, and recorded H.W.'s birth date in a family bible. But the strength of his testimony must be measured against the level of confusion and inconsistency revealed on cross-examination. For example, Wondetsaddik acknowledged that he incorrectly wrote H.W.'s birth date in the family bible, that he incorrectly wrote the date of H.W.'s baptism, and, contrary to his initial testimony, that he lived with H.W. for only one year. This cuts against the strength of his testimony.

After Wondetsaddik testified, he fled his motel and did not return to Ethiopia. Defense counsel later discovered that one of the prosecutors had given Wondetsaddik a chauffeur, meals, cash, and clothes during his trip. The prosecutor's conduct in providing Wondetsaddik such amenities without disclosure to the defense and without ensuring that Wondetsaddik remained available to testify about bias is serious. But the defense requested the trial court to either grant a mistrial or strike Wondetsaddik's testimony. We conclude it was within the trial court's broad discretion to strike the testimony and related exhibits and to instruct the jury to disregard such evidence.

Further, several factors distinguish this case from State v. Escalona,[51] relied upon by Carri. There, the State charged the defendant with second degree assault with a knife. During cross-examination, the State's witness volunteered that the defendant

---

[50] State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012) (quoting State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989)).

[51] 49 Wn. App. 251, 742 P.2d 190 (1987).

had a record and had previously stabbed someone.[52] The trial court instructed the jury to disregard the witness's statement.[53] The Escalona court characterized the unsolicited statement as "extremely serious" and "inherently prejudicial."[54] The court concluded the prejudice was not curable by an instruction.[55]

Unlike Escalona, where the irregularity involved the admission of improper character evidence, Wondetsaddik's testimony was relevant, admissible, and not inherently prejudicial. There was no "paucity of credible evidence" supporting Carri's convictions.[56] Wondetsaddik's testimony was also filled with inconsistencies and confusion. The trial court's instruction to disregard the testimony was an adequate remedy under these circumstances. The prosecutor's conduct did not taint the jury or the defendant such that the only remedy was a new trial.

Therefore, we conclude the trial court properly denied defense counsel's motion for new trial.

### Prosecutorial Misconduct

Carri contends the prosecutor committed misconduct by improperly expressing his personal opinion on the evidence in closing. We disagree.

To establish prosecutorial misconduct, a defendant must show improper conduct and resulting prejudice.[57] The defendant must demonstrate there was a substantial

---

[52] Id. at 253.

[53] Id.

[54] Id. at 255-56.

[55] Id. at 256.

[56] Id. at 255.

[57] State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (quoting State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)).

likelihood the prosecutor's misconduct "affected the jury's verdict."[58] We "review the statements in the context of the entire case."[59]

A prosecutor commits misconduct by expressing a personal opinion about either a witness's credibility or a defendant's guilt or innocence.[60] Defense counsel's failure to object to alleged prosecutorial misconduct fails to preserve the issue for appeal, unless the misconduct is "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice."[61]

During closing at trial, the prosecutor twice expressed his personal belief about the evidence:

| | |
|---|---|
| [PROSECUTOR]: | [Larry] was the one who approved of this isolation, putting them out there . . . at the picnic table or at the kitchen table, I guess, at times. He said he never gave them bad food. The fact of the matter, I think the testimony is that he did give them leftovers. And what is his response? The response was that they stole. *And I do take offense at the words --* |
| [LARRY'S COUNSEL]: | Objection. |
| | . . . . |
| THE COURT: | Ladies and gentlemen, you're instructed to disregard the statement about being offended. Go ahead.[62] |
| [PROSECUTOR]: | And we sort of had a disagreement on the witness stand . . . talking about whether you could blow up things because you would hurt this atlas. *And I disagree,* and -- |
| [LARRY'S COUNSEL]: | Objection, Your Honor. |

---

[58] Id. at 443 (quoting Magers, 164 Wn.2d at 191).

[59] Id.

[60] State v. Dhaliwal, 150 Wn.2d 559, 577-78, 79 P.3d 432 (2003).

[61] Emery, 174 Wn.2d at 760-61.

[62] RP (Sept. 4, 2013) at 20 (emphasis added).

. . . .

| | |
|---|---|
| THE COURT: | Ladies and gentlemen, you're instructed to disregard the portion of the argument where [the prosecutor] comments on his disagreement.[63] |

Larry immediately objected to both statements, but Carri did not.

Carri fails to demonstrate any prejudice that affected the jury's verdict. The trial court immediately gave an instruction to the jury to disregard the prosecutor's comments after each objection. Nothing in the record suggests the prosecutor's comments affected the verdict. This is not the type of misconduct that is so flagrant and ill-intentioned that a limiting instruction would not have cured any prejudice. Therefore, we conclude Carri's prosecutorial misconduct claim fails.

*Void for Vagueness Challenge*

Carri contends the terms "torture" and "extreme indifference to human life" as used in the homicide by abuse and first degree assault of a child statutes are unconstitutionally vague as applied to her. We disagree.

"We review constitutional issues de novo."[64] The party challenging a statute has the heavy burden of proving unconstitutionality beyond a reasonable doubt.[65] There is a "strong presumption in favor of the statute's validity."[66] A statute is void for vagueness if it "does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed," or it "does not provide ascertainable

---

[63] Id. at 42-43 (emphasis added).

[64] State v. Enquist, 163 Wn. App. 41, 45, 256 P.3d 1277 (2011).

[65] Id.

[66] State v. Harrington, 181 Wn. App. 805, 824, 333 P.3d 410 (2014).

standards of guilt to protect against arbitrary enforcement."[67] Carri argues only that the statutes lack ascertainable standards of guilt.

"Due process requires criminal statutes to establish workable standards that ensure the law will be enforced in a nonarbitrary, nondiscriminatory manner."[68] A statute must contain ascertainable standards of guilt.[69] Statutes are unconstitutionally vague when they rely upon "inherently subjective terms" that are amenable to varying and arbitrary interpretations.[70]

The term "torture" is not defined by statute, but State v. Brown[71] and State v. Russell[72] are instructive. The Brown court held that the term "torture" as used in the second degree assault statute is not unconstitutionally vague.[73] The Russell court held that the phrase "pattern or practice of assault or torture" in the homicide by abuse statute is not unconstitutionally vague.[74] The Russell court concluded the homicide by abuse statute "sets ascertainable and adequate standards of guilt," and provides "adequate guidelines to prevent subjective enforcement."[75]

Carri cites no authority to support that the term "extreme indifference" is unconstitutionally vague. Although the homicide by abuse statute does not define

---

[67] Id. at 823.

[68] State v. Evans, 177 Wn.2d 186, 207, 298 P.3d 724 (2013).

[69] In re Detention of Danforth, 173 Wn.2d 59, 73, 264 P.3d 783 (2011); City of Seattle v. Drew, 70 Wn.2d 405, 408, 423 P.2d 522 (1967).

[70] Evans, 177 Wn.2d at 207.

[71] 60 Wn. App. 60, 802 P.2d 803 (1990).

[72] 69 Wn. App. 237, 848 P.2d 743 (1993).

[73] Brown, 60 Wn. App. at 66.

[74] Russell, 69 Wn. App. at 248.

[75] Id. at 247-48.

17

"extreme indifference," nothing suggests that it is inherently subjective and subject to arbitrary enforcement. The term "extreme" means "existing in the highest or the greatest possible degree; very great; very intense."[76] The term "indifference" means "the quality or state of being indifferent."[77] The term "indifferent" means "looked upon as not mattering one way or another" or "regarded as being of no significant importance or value."[78] The plain meaning of "extreme indifference" provides adequate guidelines to prevent arbitrary enforcement by a jury, judges, prosecutors, or police officers.[79]

Therefore, we conclude the terms "extreme indifference" and "torture" provide an ascertainable standard of guilt and are not inherently subjective as applied to Carri's conduct.

### Admission of the State's Experts' Testimony

Carri contends the trial court abused its discretion in admitting expert testimony on the meaning of "torture." We disagree.

---

[76] WEBSTER'S THIRD NEW INT'L DICTIONARY 807 (3d ed. 2002); see also State v. Madarash, 116 Wn. App. 500, 512, 66 P.3d 682 (2003).

[77] WEBSTER'S THIRD NEW INT'L DICTIONARY 1151 (3d ed. 2002); see also Madarash, 116 Wn. App. at 512.

[78] WEBSTER'S THIRD NEW INT'L DICTIONARY 1151 (3d ed. 2002); see also Madarash, 116 Wn. App. at 512.

[79] We also reject Carri's contention that the vagueness issue was exacerbated when the trial court refused to give Carri's proposed definitional instruction on "extreme indifference." See CP at 234 ("'Extreme indifference to human life' means to not care whether the deceased lived or died."). The plain meaning of "extreme indifference" provided the jury adequate standards to determine the culpability of Carri's conduct as to H.W.

We review a trial court's decision to admit expert testimony for abuse of discretion.[80] The trial court has broad discretion to determine the admissibility of testimony.[81]

ER 702 governs the admissibility of expert testimony. Expert testimony is admissible "if the expert testimony would be helpful to the trier of fact"[82] and if it "is informed by specialized knowledge, experience, or training."[83] Expert testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and it is not misleading.[84] "Courts generally 'interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases.'"[85] But expert testimony is unnecessary for issues involving matters of common knowledge.[86]

There may be some tension between concluding that the term "torture" provides an ascertainable standard of guilt, but the jury needs expert testimony on what constitutes torture. But these two positions are not inconsistent. Whereas the term "torture" as used in the homicide by abuse and first degree assault of a child statutes provides the prosecutor with ascertainable standards of guilt for charging decisions, a juror may still find it *helpful* for an expert to explain subtler forms of torture. The State's expert witnesses testified that the use of corporal punishment, humiliation, isolation,

---

[80] State v. Kirkman, 159 Wn.2d 918, 927, 155 P.3d 125 (2007).

[81] City of Seattle v. Heatley, 70 Wn. App. 573, 579, 854 P.2d 658 (1993).

[82] Russell, 125 Wn.2d at 69.

[83] State v. Nelson, 152 Wn. App. 755, 767, 219 P.3d 100 (2009).

[84] State v. Thomas, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004).

[85] Moore v. Hagge, 158 Wn. App. 137, 155, 241 P.3d 787 (2010) (quoting Miller v. Likins, 109 Wn. App. 140, 148, 34 P.3d 835 (2001)).

[86] State v. Smissaert, 41 Wn. App. 813, 815, 706 P.2d 647 (1985).

sensory deprivation, and denial of food constitute aspects of torture. The experts' specialized knowledge helped the jury understand that some of the conduct here was a subtle form of torture, extended over a period of time, and systematized.

Therefore, we conclude the trial court did not abuse its discretion in admitting expert testimony on the meaning of the term "torture."

*Public Trial Right*

Carri's public trial argument fails. In <u>State v. Love</u>, our Supreme Court approved sidebar conferences for the exercise of peremptory jury strikes on paper, concluding that this practice did not amount to a courtroom closure.[87]

*Cumulative Error*

We reject Carri's contention that the cumulative effect of the alleged errors at trial denied her a fair trial. She fails to demonstrate any single instance of error.

## CONCLUSION

We affirm Carri's convictions for homicide by abuse and first degree assault of a child.

WE CONCUR:

_____

Trickey, J

_____


_____

[87] 183 Wn.2d 598, 606-08, 354 P.3d 841 (2015).