# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

STATE OF WASHINGTON,

Respondent,

v.

CYNTHIA SUE MILLER,

Appellant.

No. 48672-5-II

UNPUBLISHED OPINION

CRUSER, J. — Cynthia Sue Miller appeals her conviction and sentence for two counts of first degree child assault and two counts of second degree child assault.[1] She also challenges certain aggravating factors related to these convictions. Miller argues that the evidence was insufficient to support these convictions. Miller further contends that the trial court erred because the aggravating factors of "deliberate cruelty" were not supported by the evidence and the exceptional sentence was not warranted. Lastly, Miller argues that the trial court improperly denied her motion for release on bail pending appeal.[2] Miller raises additional arguments in her statement of additional grounds (SAG).

---

[1] Miller also was convicted of one count of third degree child assault and one count of fourth degree criminal mistreatment, but she does not appeal those convictions.

[2] In a footnote, Miller argues that that the trial court erred in allowing an expert witness to testify as to the definition of torture. Miller does not assign error to this issue. Because this argument is made in a footnote, we decline to consider it. *State v. Harris*, 164 Wn. App. 377, 389 n.7, 263 P.3d 1276 (2011).

We conclude that the evidence was sufficient to support the first degree child assault and second degree child assault convictions. We additionally conclude that the trial court's findings that Miller's crimes manifested deliberate cruelty were supported by the evidence. Also, the trial court properly exercised its discretion in denying Miller's request for an appeal bond. And we reject Miller's SAG arguments. Accordingly, we affirm.

FACTS

I. BACKGROUND FACTS

S.K.[3] lived with her grandmother, Miller. In October 2013, when S.K. was nine years old, the Department of Social and Health Services (DSHS) received a report concerning possible neglect of S.K. A social worker went to S.K.'s school to meet with S.K. When the social worker first observed S.K., she noticed that S.K. was wearing clothes that looked older and a little bit faded and that S.K. had some abrasions on her face.

The social worker asked S.K. about her grandmother, Miller, and S.K.'s "demeanor changed a little bit and she started to fidget with some of her little toys that were on the desk and she averted her gaze and looked down." 2 Verbatim Report of Proceedings (VRP) at 284. The social worker indicated that S.K. looked a bit uncomfortable and then S.K. said her grandmother was really nice. S.K. told the social worker that her two cousins and her sister slept in a room together and that S.K. sleeps in a back bedroom with her other cousin. S.K. also said that "she ha[d] to ask her grandma before she c[ould] eat and she said there was a lock on the refrigerator and sometimes that she st[ole] food." *Id.* at 286.

---

[3] We use initials to identify minor victims to protect their privacy.

The social worker and Thurston County Sheriff's Deputy Jamie Gallagher spoke with Miller at her home. Miller said that she had "whipped" S.K. the night before. *Id.* at 291. Miller denied that there was a lock on the refrigerator, but she did say that there was a lock on the freezer and that "she doesn't allow the children to go through the refrigerator freely." *Id.* at 292.

An advanced registered nurse practitioner examined S.K. at the Child Abuse and Sexual Assault and Maltreatment Center. S.K. continued to eat throughout the entire time she was at the clinic. The nurse practitioner observed that S.K. had multiple facial injuries. She also had bruises on her entire body including "patterned bruising around the lateral aspect of the right buttock" and "small, circular, brown . . . fingerprint pattern bruising." 1 VRP at 151. There was also bruising "between her labia and her anus" and there was "erythema or redness on both sides" and bruising "up against her left labia but more in the fold of her groin." *Id.* at 152. There was a three-inch raised scratch on her scalp. Furthermore, she had red dots on both sides of her eyelids called "petechiae." *Id.* at 157. The nurse practitioner testified that "[t]ypically, we see that more in strangulation or some sort of an airway occlusion, but because or it also could be how she -- how she is." *Id.* at 157. X-rays were taken of S.K. on November 5.

Dr. Shireen Khan, a pediatric radiologist, reviewed S.K.'s x-rays and rendered a report. The X-rays showed that S.K. had five different fractures on her body including "both of her ulnas, her elbow, her pinkie finger and her toe." 3 VRP at 455.

Khan described the X-ray showing S.K.'s pinky finger and said that it showed "inflammation and thickening of kind [of] the outer lining of bone that happens with inflammation or with healing fractions" and that there was "buckling" which can be from trauma. *Id.* at 444. She dated this injury to be about 10 days to 3 or 4 weeks old at the time the X-rays were taken. In

the X-ray of S.K.'s left forearm, she noted that there was "a lucency fracture through the back of the mid ulna, and along the lateral margin of it you see really smooth, fairly mature periostitis" indicative of a "largely healed fracture" that she said was a "month or two old." *Id.* at 447. When asked if a child would obtain this type of fracture through trauma, Khan responded, "Typically, a long fracture is traumatic." *Id.* at 448.

On that same arm, Khan described a "lateral condylar fracture of the humerus," an elbow fracture. *Id.* This fracture was consistent with trauma. Khan could not say how old the "[l]ateral condylar fractures" were but they could be months old. *Id.* at 454. There was also healing evidence of a fracture along the ulna of S.K.'s right arm. This fracture could be 10 days to 3 or 4 weeks old. Also, there was a subacute fracture on S.K.'s left toe. "Subacute" means that the fracture is in the early stages of healing so it was about 7 to 14 days old.

The social worker questioned the other children in the home as part of the investigation. One of the children said that S.K. had a demon inside her and that because of this, S.K. had to stand in a corner with a bible over her head while they shouted "Jehovah" at her. 2 VRP at 352. S.K.'s sister talked about Miller "beating" S.K. *Id.* at 350.

Gallagher interviewed S.K. on November 18. S.K. seemed reluctant to talk about Miller and would change the subject. During this interview, S.K. denied that she had ever been hurt. However, she did say that her mom or grandma and her cousins and sister thought that she had a demon in her body.

The State initially charged Miller with second degree child assault –domestic violence.

S.K. was moved into a foster home and began making disclosures to her foster parent, Kristen Whitcomb. Whitcomb testified that when S.K. first started living with her, "[s]he had a

4

lot of scabbing on her face. . . . She was really thin, her hair was falling out. . . . Her clothes were bleach sustained [sic]." *Id.* at 255. S.K. would hide in public areas because she was afraid her grandmother would find her. S.K. told Whitcomb that sometimes she would not be allowed to eat when she was in the care of her grandmother, and she would have to sit at the kitchen table and watch everybody else eat. S.K. also said that her sister would sneak her food because she did not get to eat that day. S.K. also disclosed to Whitcomb that she had to stand against a wall while her grandmother and cousin would yell "Jehovah" at her. *Id.* at 259.

> Whitcomb further testified that S.K. revealed that
>
> her grandmother had held her head underneath water in the bathtub, that her grandmother would tie her wrists to the door in the bathroom when company was over and tell them that she was not there and she would get juice and water and until the company was gone. That could last up to two days. She told me that she was beat with a bamboo stick.

*Id.* at 259. Whitcomb said S.K. indicated that she could not breathe when her grandmother held her under water. Miller used a cane to beat the "demon" out of S.K., and S.K. said that this happened 16 to 22 times. *Id.* at 260. Whitcomb testified that S.K. told her that on one occasion her grandmother was mad at her, said she was going to kill her, and came after her with a steak knife.

Gallagher interviewed S.K. again on December 31. Gallagher noted that "[s]he was taller, her hair had started to grow back. . . . I didn't notice as much scarring and scabs on her face, she looked like she had put on weight." 3 VRP at 490. During this interview, S.K. disclosed to Gallagher that Miller had tried to drown her in the bathtub. She said Miller "put her hand on my head and pushing [sic] my head in the water." Ex. 37 at 6. She told Gallagher that Miller was mad when that happened and that her sister was trying to stop Miller.

S.K. said that sometimes Miller would tie S.K.'s hands together and to the bed. Miller "would use tight straps and she was tying it really bad where my wrist [sic] were red." *Id.* at 10. When describing the "straps," S.K. said they were black and "have these little things that you just pull a string and tie it as good as you could." *Id.* This happened "[a] lot of times." *Id.* Miller was the only one that ever tied her up. This happened in third grade and her wrists would be sore for five or six days.

When asked about the bruises, S.K. said she was hit by this "hard stick, it was very long and it was very hard and it hurts really bad." *Id.* at 11. S.K. told Gallagher that she did not think she was treated the same as the other kids in the house and that the other kids were never tied to their beds. She was not able to eat for a couple of days, but the other children could eat.

## II. BENCH TRIAL

Miller waived her right to a jury trial, and a bench trial was held. S.K. testified at trial. S.K. described how Miller would hold her underwater and she was not able to breath. She said this happened more than once. S.K. also described how Miller would hit her with a bamboo stick and Miller would hit her "about ten times sometimes." 1 VRP at 65. S.K. testified that Miller tied her to her bed and how her wrists were sore for more than a week after. She also testified that her hands would be tied together with a rope in the bathroom and she sometimes had to sleep in the bathroom.

When asked if she was ever spanked by Miller, S.K. responded, "Yes. I would get spanked with a belt." *Id.* at 73. S.K. said that she had bruises from Miller hitting her. When asked if she had scars from Miller, S.K. said, "Yes . . . [o]n my bottom. . . . Well, they're actually not scars, they're actually scar tissue." *Id.*

6

When asked if other people hurt her in the house, S.K. said, "There was a person name [sic] Dean and he used to roll me in the carpet and slammed [sic] me on the floor." *Id.* at 75. However, when asked whether the other things she had talked about were things Miller did to her, S.K. responded, "Yeah." *Id.*

S.K.'s sister, S.W., also testified. S.W. testified that S.K. was not treated the same as the others in the house and said, "[S]he was kind of in a lot of pain and . . . she wasn't really treated really nice." *Id.* at 118. S.W. described a time when Miller got a pillow, put it in S.K.'s face, sat on S.K., and then laughed about it. S.W. said that S.K. could not breathe when this happened.

Dr. Joyce Gilbert, the Medical Director of the Sexual Assault Clinic and Child Maltreatment Center at Providence St. Peter Hospital, testified as an expert for the State. She testified that the clinical definition of "torture" was

> two distinct separate episodes of physical assault or one prolonged episode of physical assault in addition to two or more episodes of psychological maltreatment, which then results in severe injury to the child and/or can result in death of the child.

2 VRP 385-86. She asserted that psychological maltreatment can include isolating a child or depriving the child of food, water, and nourishment. In comparison to child abuse, torture is more of the "dehumanizing, degrading aspect, terrorizing the child" and "there's much more dominance and control." *Id.* at 388.

The defense presented the testimony of a child protective services worker, Alex Tarasar. Tarasar testified that he investigated a case involving H.W. and A.W., who were S.K.'s cousins, and he placed them in the home of Miller. Tarasar walked through Miller's home on October 11, 2013, and Miller told him that S.K. was a challenging child for her. He said that there appeared to

be food available for the children at that time. However, he noted that S.K. "appeared to be very shy and quiet and withdrawn." 4 VRP at 651.

During trial, the State filed a third amended information. The third amended information charged Miller with first degree child assault—domestic violence based on the fractured ulna (count I), first degree child assault—domestic violence based on the lateral condylar fracture of the humerus (count II), second degree child assault—domestic violence based on recklessly inflicting substantial bodily harm or intentionally strangling or suffocating S.K. (count III), third degree child assault—domestic violence (count IV), fourth degree criminal mistreatment—domestic violence (count V), second degree child assault—domestic violence based on intentional suffocation (count VI).[4] The State alleged aggravating circumstances on counts I through IV. Miller did not object to the third amended information. The following colloquy occurred between the court and Miller's defense counsel:

> THE COURT: . . . I take it that you took the time during our break to talk to your client about the third amended information?
> [DEFENSE COUNSEL:] I did, Your Honor. She can be arraigned on it. She's familiar with the amendment now. She's prepared to be arraigned and waive arraignment, waive further advisement, enter a plea of not guilty to the third amended complaint, waive reading.

*Id.* at 602-03.

### III. VERDICT AND SENTENCING

The trial court found Miller guilty of first degree child assault—domestic violence, under the substantial bodily harm prong (the fracture of the ulna) (count I), first degree child assault—

---

[4] The third amended information also charged Miller with alternatives for counts I and II. The alternative for count I was second degree child assault—domestic violence and the alternative for count II was second degree child assault—domestic violence.

domestic violence, under the substantial bodily harm prong (the fracture of the humerus) (count II), second degree child assault—domestic violence by recklessly inflicting substantial bodily harm (count III), third degree child assault—domestic violence (count IV), fourth degree criminal mistreatment—domestic violence (count V), and second degree child assault—domestic violence by suffocation (count VI).

The trial court also found aggravating circumstances for counts I, II, III, and IV. The aggravating circumstances that are germane to this appeal are that Miller's conduct manifested deliberate cruelty to S.K. pursuant to RCW 9.94A.535(3)(a) and that Miller's conduct constituted deliberate cruelty to or intimidation of S.K. while being an offense involving domestic violence under former RCW 10.99.020 (2004) pursuant to RCW 9.94A.535(3)(h)(iii).[5]

The trial court imposed a total exceptional sentence of 423 months. Miller appeals her conviction and sentence.

IV. MOTION FOR RELEASE PENDING APPEAL

After sentencing, Miller filed a motion in the superior court for release on bail pending appeal. The superior court ruled that

> the decision to grant or deny an appeal bond is a discretionary decision of the Court. Release on bail in this case is inappropriate due to the seriousness of the offenses. The record does not show any extenuating circumstances that would make release on an appeal bond appropriate given the particular facts and circumstances of this case.

Clerk's Papers (CP) at 415. Miller also appeals the superior court's ruling on bail pending appeal.

---

[5] Miller does not challenge the remaining aggravating circumstances that were found by the trial court. Therefore, we do not discuss them.

DISCUSSION

I. SUFFICIENCY OF THE EVIDENCE

Miller argues that the State failed to prove beyond a reasonable doubt that Miller was guilty of two counts of first degree child assault and two counts of second degree child assault. We disagree.

A. PRINCIPLES OF LAW

The State must prove each essential element of a crime beyond a reasonable doubt. *State v. Chacon*, 192 Wn.2d 545, 549, 431 P.3d 477 (2018). Evidence is sufficient to support a conviction if, viewing the evidence in the light most favorable to the State, any rational trier of fact can find the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 220-22, 616 P.2d 628 (1980). "All reasonable inferences from the evidence are drawn in favor of the State and interpreted most strongly against the defendant. A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial and direct evidence carry equal weight. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). "Credibility determinations are for the trier of fact and cannot be reviewed on appeal." *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

B. FIRST DEGREE CHILD ASSAULT

The State charged Miller with two counts of first degree child assault. The alleged substantial bodily harm for count I was a fractured ulna and for count II it was a fractured humerus. Miller argues that there was insufficient evidence to convict her of the two counts of first degree child assault.

10

To convict Miller of first degree child assault as charged, the State had to prove beyond a reasonable doubt that Miller was 18 years of age or older and that she, on or between March 17, 2011 and October 31, 2013, intentionally assaulted S.K., caused substantial bodily harm, and

> ha[d] previously engaged in a pattern or practice either of (A) assaulting the child which [ ] resulted in bodily harm that [was] greater than transient physical pain or minor temporary marks, or (B) caus[ed] the child physical pain or agony that [was] equivalent to that produced by torture.

RCW 9A.36.120(1)(b)(ii).

### 1. SUBSTANTIAL BODILY HARM

Specifically, Miller argues that there was no evidence presented at trial to show that she caused substantial bodily harm to S.K. Miller states that S.K.'s testimony established that Miller caused only "transient physical pain or minor temporary marks."[6] Appellant's Opening Br. at 31. With regard to S.K.'s fractures, Miller argues that she could not be found beyond a reasonable doubt to be the cause of those injuries.

Substantial bodily harm is defined as "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the

---

[6] Miller cites to *State v. Aten*, 130 Wn.2d 640, 927 P.2d 210 (1996), multiple times throughout her brief to argue that S.K.'s statements were inconsistent and refuted at trial and are not evidence of the body of the crime. But Miller's reliance on *Aten* is misplaced.

Corpus delicti means the "'body of the crime.'" *Id.* at 655 (quoting 1 MCCORMICK ON EVIDENCE § 145 at 227 (John W. Strong ed., 4th ed. 1992)). The court in *Aten* explained that the corpus delicti rule prevents defendants from being convicted based on a defendant's own confessions or admissions alone and that the State must present independent evidence other than the confession that the crime a defendant described took place. *Id.* at 656-57. Miller relies on *Aten* to say that "[a] statement from a minor is not evidence of the body of the crime." Appellant's Opening Br. at 32 n.2. This is a misstatement of the law.

11

function of any bodily part or organ, or which causes a fracture of any bodily part." RCW 9A.04.110(4)(b).

Dr. Khan, a pediatric radiologist, testified at trial that S.K. had five different fractures on her body including "both of her ulnas, her elbow, her pinkie finger and her toe." 3 VRP at 455. She further testified that as a pediatric radiologist, in all of her almost 18 years of experience, she had never seen this many fractures in a 9-year-old other than those who "have a history of recent major trauma like [a motor vehicle accident] or something like that." *Id.* Khan testified that the fractures were consistent with trauma. She also testified that the pinky finger fracture in the X-ray was about 10 days to 3 or 4 weeks old, the left ulna fracture was about a month or two old, the right ulna fracture was 10 days to 3 or 4 weeks old, and the subacute fracture on S.K.'s toe was about 7 to 14 days old. X-rays were taken of S.K. on November 5.

The nurse practitioner who examined S.K. testified about the bruising all over S.K.'s body. She described the pattern bruising on S.K.'s right buttock. The nurse practitioner testified that "[o]n an abused child of this age, the data supports and shows that there's frequently bruising on the face, the head, the neck, followed by the buttock and the trunk." 1 VRP at 165. She testified that "when we have all of these bruises all together on one little body without any explanation of what happened, it is [sic] big red flag for nonaccidental trauma." *Id.* at 167. The court reviewed the photos of the cuts and bruises on S.K.'s body as well as the X-rays and traumagram.

S.K. testified that Miller tied her to her bed with straps that would tighten around her wrists and that her wrists were sore for more than a week after this happened. S.K. told the detective that this happened in third grade. Taken together with the fractured wrists, this is circumstantial

evidence that S.K.'s fractures were caused by Miller tying her up. Circumstantial and direct evidence carry equal weight. *Delmarter*, 94 Wn.2d at 638.

Additionally, S.K. testified that Miller hit her with a bamboo stick. S.K. said that she had bruises from Miller hitting her. When viewing the evidence in the light most favorable to the State, any rational trier of fact could find that Miller intentionally assaulted S.K. and caused substantial bodily harm.

2. PATTERN OF ASSAULT/TORTURE

Miller argues that there was no evidence presented at trial that Miller engaged in a pattern of assault for the purpose of causing S.K. pain equivalent to torture as required under RCW 9A.36.120. Miller argues that the State "only has evidence that Miller spanked S.K. on the buttocks, that Miller tied S.K.'s arms one night to keep her from getting into mischief—both of which are allowed under RCW 9A.16.100."[7] Appellant's Opening Br. at 35.

Miller relies on *State v. Jennings*, 106 Wn. App. 532, 24 P.3d 430 (2001), as a "proper template" for what constitutes torture. Appellant's Opening Br. at 35. In *Jennings*, the defendant pleaded guilty to first degree child assault where he stated that he

> "fractured the skull and tibia of L.T. while she was less than 13 years old and inserted lamp oil into L.T.'s veins causing severe metabolic acidosis. [He] also, with intent to inflict great bodily harm against L.T., intentionally assaulted her by inserting a spoon into her rectum and vagina thereby causing pain or agony equivalent to torture."

---

[7] RCW 9A.16.100 provides that "the physical discipline of a child is not unlawful when it is reasonable and moderate and is inflicted by a parent, teacher, or guardian for purposes of restraining or correcting the child."

106 Wn. App. at 538. We are unpersuaded that in order to constitute torture, the "torture" has to be equivalent to the same factual scenario in *Jennings.*

Chapter 9A.36 RCW does not contain a definition of torture. *State v. Brown*, 60 Wn. App. 60, 65-66, 802 P.2d 803 (1990), *overruled on other grounds by State v. Chadderton*, 119 Wn.2d 390, 832 P.2d 481 (1992), and *State v. Russell*, 69 Wn. App. 237, 247, 848 P.2d 743 (1993), are instructive. The court in *Brown* held that the term "torture," as used in the second degree assault statute, was not unconstitutionally vague because it "provides notice, with a reasonable degree of certainty, of what conduct is forbidden." 60 Wn. App. at 66. In *Russell*, we also determined that the word "torture" in the homicide by abuse statute may be commonly understood. 69 Wn. App. at 247.

At trial, Dr. Gilbert testified as to the clinical definition of "torture":

[T]wo distinct separate episodes of physical assault or one prolonged episode of physical assault in addition to two or more episodes of psychological maltreatment, which then results in severe injury to the child and/or can result in death of the child.

2 VRP 385-86.[8]

Here, the State presented sufficient evidence that Miller had engaged in a pattern or practice of causing S.K. physical pain or agony that was equivalent to that produced by torture. There was evidence that Miller treated S.K. differently from the other children and would deprive S.K. of

---

[8] In a footnote, Miller argues that that the court erred in allowing an expert witness to testify as to the definition of torture. Miller does not assign error to this issue. Because this argument is made in a footnote, we decline to consider it. *Harris*, 164 Wn. App. at 389 n.7. Placing an argument in a footnote is ambiguous as to whether it is intended to be part of the appeal. *State v. Johnson*, 69 Wn. App. 189, 194 n.4, 847 P.2d 960 (1993). "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

food. S.K. testified that Miller tied her to her bed "almost every night." 1 VRP at 68. S.K's sister, S.W., testified that S.K. "was kind of in a lot of pain and . . . she wasn't really treated really nice." *Id.* at 118. Additionally, the State presented evidence that Miller repeatedly beat S.K. with a bamboo stick. There was also testimony that Miller believed S.K. had a "demon" inside her and would force her to hold a bible over her head while Miller yelled Jehovah. *Id.* at 64-65.. The State's evidence demonstrated both physical and psychological forms of torture.

### 3. OTHER SUSPECT

Miller additionally contends that there was a reasonable doubt because someone else could have caused S.K.'s injuries. However, we disagree because S.K. identified Miller as the person who committed these crimes. Although S.K. also described an incident where a person named Dean rolled her into a carpet and threw her on the floor, S.K. identified Miller as the person who had hit her with a stick, tied her to her bed, and deprived her of food. Therefore, Miller's argument fails.

In viewing the evidence in the light most favorable to the State, we conclude that any rational trier of fact could find that Miller committed the two counts of first degree child assault beyond a reasonable doubt. Thus, Miller's claim that there is insufficient evidence to support her two convictions for first degree child assault fails.

### C. SECOND DEGREE CHILD ASSAULT

The State charged Miller with two counts of second degree child assault. The basis for count III was that Miller committed second degree assault of a child by intentionally assaulting S.K. who was under the age of 13 and thereby recklessly inflicted substantial bodily harm or that Miller intentionally strangled or suffocated S.K, a child. RCW 9A.36.130(1)(a), .021(1)(a), (g).

The trial court found Miller guilty of count III based on "recklessly inflict[ing] substantial bodily harm." CP at 191. For count VI, the State alleged that Miller committed second degree assault of a child by intentionally suffocating S.K. RCW 9A.36.130(1)(a), .021(1)(g). The court found Miller guilty of this count stating that Miller assaulted S.K. by suffocation. Miller argues that there was insufficient evidence to convict Miller of the two counts of second degree child assault.[9] We disagree.

1. SECOND DEGREE ASSAULT BY SUBSTANTIAL BODILY HARM—COUNT III

Miller argues that the State failed to prove beyond a reasonable doubt that Miller recklessly inflicted substantial bodily harm.

As described above, the State presented evidence of S.K.'s five fractures. The fractures were consistent with trauma. S.K. testified that Miller hit her with a bamboo stick. S.K. also told Detective Gallagher that she was hit by this "hard stick, it was very long and it was very hard and it hurts really bad." Ex. 37 at 11. S.K. testified that Miller hit her with a bamboo stick about 10 times. The State presented sufficient evidence that Miller recklessly inflicted substantial bodily harm on S.K.

2. SECOND DEGREE ASSAULT BY SUFFOCATION—COUNT VI

Miller argues that "[t]he State also failed to prove beyond a reasonable doubt that [she] previously engaged in a pattern or practice of assaulting S.K. that resulted in bodily harm that is

---

[9] Miller does not specify which counts she is challenging. Under the third amended information, Miller was alternatively charged with second degree assault of a child for counts I and II. Miller was then also charged with second degree assault of a child in counts III and VI. The trial court did not find Miller guilty of the alternative charges in counts I and II. However, the court found Miller guilty of second degree assault of a child in counts III and VI. Therefore, we assume Miller is challenging counts III and VI.

greater than transient pain or minor temporary marks, or causing pain or agony to S.K. equivalent to torture." Appellant's Opening Br. at 42. However, Miller is arguing insufficient evidence based on the wrong statute. Miller ignores the fact that for second degree assault of a child under RCW 9A.36.130(1)(a), a person is guilty if they commit the crime of second degree assault as defined in RCW 9A.36.021 against a child, which includes assaulting another by "strangulation or suffocation." RCW 9A.36.021(g). This is one of the provisions with which Miller was charged and found guilty of.

Suffocation is the "means to block or impair a person's intake of air at the nose and mouth, whether by smothering or other means, with the intent to obstruct the person's ability to breathe." RCW 9A.04.110(27). At trial, S.K. testified that Miller held her head underwater in the bathtub. She said that she could not breathe and her face turned blue. And she asserted that this happened more than once. S.K. disclosed this information to Whitcomb and Gallagher, which was presented at trial, and S.K. also testified to this at trial. Furthermore, S.K.'s sister, S.W., testified that Miller retrieved a pillow, put the pillow in S.K.'s face, and sat on her. S.W. said that Miller laughed about it and that S.K. could not breathe.

"Credibility determinations are for the trier of fact." *Camarillo*, 115 Wn.2d at 71. It appears the judge found S.K.'s and her sister's testimony credible at trial. We conclude that sufficient evidence supported the conviction for count VI based on the evidence of suffocation.

Ultimately, we conclude that the State presented sufficient evidence to support the two counts of second degree child assault.[10]

## II. EXCEPTIONAL SENTENCE

The trial court found aggravating factors for counts I, II, III, and IV. Miller argues that the court improperly imposed an exceptional sentence because the aggravating factors were not supported by the evidence. In her analysis, however, Miller appears to challenge only the findings of "deliberate cruelty." To the extent that certain sentences in her brief could be read as an attempt by Miller to challenge all of the aggravating factors, her brief contains no argument relating to any factor other than deliberate cruelty. Therefore, we consider only the aggravating factors related to "deliberate cruelty." *See* RAP 10.3(a)(6). We conclude that the trial court did not err.

A. PRINCIPLES OF LAW

A trial court may impose a sentence outside the standard sentence range for an offense if it finds that there are substantial and compelling reasons to justify an exceptional sentence. RCW 9.94A.535.[11] To reverse a sentence outside the standard range, we must find that either the reasons

---

[10] Miller asks us to consider additional evidence outside the record pursuant to RAP 9.11 and ER 201. Miller requests that we review the transcript of proceedings in a separate case where "Kenneth Spears confesses to sexually assaulting S.K." Appellant's Opening Br. at 38. Miller tries to add to the record in this case based on her personal restraint petition (PRP). But in Miller's PRP, we already decided this evidence would likely not change this court's decision. *In re Pers. Restraint of Miller*, No. 49451-5-II, slip op. at 7 (Wash. Ct. App. Jan. 23, 2018) (unpublished), http:/www.courts.wa.gov/opinions/pdf/D2%2049451-5-II%20Unpublished%20Opinion.pdf. Thus, we reject these arguments.

[11] We cite to the current version of the statute because, for our purposes, it has remained substantively the same.

for the sentence are not supported by the record or the reasons do not justify the sentence outside the standard range, or that the sentence was clearly excessive or lenient. RCW 9.94A.585(4).

There are three questions that we analyze to determine the appropriateness of an exceptional sentence:

> "1. Are the reasons given by the sentencing judge supported by evidence in the record? As to this, the standard of review is clearly erroneous.
> 2. Do the reasons justify a departure from the standard range? This question is reviewed de novo as a matter of law.
> 3. Is the sentence clearly too excessive or too lenient? The standard of review on this last question is abuse of discretion."

*State v. Law*, 154 Wn.2d 85, 93, 110 P.3d 717 (2005) (quoting *State v. Ha'mim*, 132 Wn.2d 834, 840, 940 P.2d 633 (1997), *abrogated by State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015)).

B. DELIBERATE CRUELTY

Miller's brief contains argument and analysis for only the "deliberate cruelty" aggravating factor, but it is unclear whether she is asking us to reverse the deliberate cruelty aggravating factor as to counts I, II, III, and IV, or just two of the four counts. Miller states without citation to the record that "[t]wo of them rely on a finding of *'deliberate cruelty'* which the lower court clearly did not have evidence to support." Appellant's Opening Br. at 47.

For counts I, II, III, and IV, the trial court found that Miller's conduct manifested deliberate cruelty to S.K. pursuant to RCW 9.94A.535(3)(a). The court also found that for these four counts, Miller's conduct constituted deliberate cruelty to S.K. under RCW 9.94A.535(3)(h)(iii), which requires that the offense involve domestic violence under former RCW 10.99.020.[12]

---

[12] Former RCW 10.99.020(8) defines victim as "a family or household member who has been subjected to domestic violence."

Deliberate cruelty is "'gratuitous violence or other conduct which inflicts physical, psychological, or emotional pain as an end in itself.'" *State v. Copeland*, 130 Wn.2d 244, 296, 922 P.2d 1304 (1996) (quoting *State v. Scott*, 72 Wn. App. 207, 214, 866 P.2d 1258 (1993), *aff'd sub nom. State v. Ritchie*, 126 Wn.2d 388, 894 P.2d 1308 (1995), *abrogated by O'Dell*, 183 Wn.2d 680)). It involves "'cruelty of a kind not usually associated with the commission of the offense in question.'" *Id.* (internal quotation marks omitted) (quoting *State v. Crane*, 116 Wn.2d 315, 334, 804 P.2d 10 (1991), *abrogated by In re Pers. Restraint of Andress*, 147 Wn.2d 602, 565 P.3d 981 (2002)).

Miller contends that there was a lack of evidence at trial that Miller had an intent of causing S.K. pain or emotional distress. Miller further contends that the only injury that "could even conceivably be linked to an act" by Miller was the ulnar fracture, which did not appear to be particularly serious. Appellant's Opening Br. at 51. Miller also appears to argue that the court erred by considering elements of the crimes charged as factors supporting the exceptional sentence. We disagree.

With respect to counts I, II, III, and IV, Miller's conduct exceeded that required to prove the elements of the offenses. S.K. had five fractures consistent with fractures from trauma. S.K. had severe pattern bruising over her body. The pediatric radiologist, testified that in almost 18 years of experience, she had never seen this many fractures in a 9-year-old other than those who "have a history of recent major trauma like [a motor vehicle accident] or something like that." 3 VRP at 455.

S.K. testified that specifically, Miller hit her with a bamboo stick about 10 times sometimes. She said that Miller tied her to her bed with her two wrists together "almost every

night." 1 VRP at 68. S.K. also said that her wrists hurt "almost the whole night" because she would move and the ties would get tighter and tighter. *Id.* at 69. S.K. stated that Miller would also tie her hands together with a rope and attach the rope to the shower rod so that she was forced to sleep in the bathtub. And S.K. asserted that Miller held her head under water "[m]ore than once." *Id.* at 62.

There also was evidence presented at trial that Miller treated S.K. differently than the other children. Miller would sometimes not give S.K. food and when she did give her food, it would be leftover scraps. S.K.'s sister said that she would share her food with S.K. because she thought S.K. did not get enough. Miller said that S.K. had a demon inside her and would force S.K. to hold a bible over her head while they said Jehovah.

Based on the evidence, we conclude that the trial court's findings of "deliberate cruelty" for counts I, II, III, and IV were supported by the record. Thus, the trial court did not abuse its discretion in imposing an exceptional sentence.

### III. MOTION FOR RELEASE ON BAIL

Miller argues that the court improperly denied her motion for release on bail pending appeal. We disagree.

### A. PRINCIPLES OF LAW

"There is no right to release pending appeal." *State v. Cole*, 90 Wn. App. 445, 447, 949 P.2d 841 (1998); *State v. Smith*, 84 Wn.2d 498, 499, 527 P.2d 674 (1974). Trial courts have broad discretion to decide whether to release a defendant pending appeal. *Cole*, 90 Wn. App. at 447. We review a trial court's decision to deny bail pending appeal for abuse of discretion. *Cole*, 90 Wn. App. at 447; *Smith*, 84 Wn.2d at 501-03.

RCW 10.73.040 addresses bail pending appeal and provides in part,

> In all criminal actions, except capital cases in which the proof of guilt is clear or the presumption great, upon an appeal being taken from a judgment of conviction, the court in which the judgment was rendered, or a judge thereof, must, by an order entered in the journal or filed with the clerk, fix and determine the amount of bail to be required of the appellant.

CrR 3.2(h) provides, "After a person has been found or pleaded guilty, and subject to RCW 9.95.062, 9.95.064, 10.64.025, and 10.64.027, the court may revoke, modify, or suspend the terms of release and/or bail previously ordered."

B. THE TRIAL COURT DID NOT ERR IN DENYING THE MOTION FOR RELEASE ON BAIL PENDING APPEAL

Miller asserts that under RCW 10.73.040, the court must fix and determine the amount of bail required. The court in *Smith* stated that "the fixing of bail and the release from custody traditionally has been, and we think is, a function of the judicial branch of government." 84 Wn.2d at 501. The court held that to the extent RCW 10.73.040 conflicted with former CrR 3.2(h) (1973),[13] it was superseded by former CrR 3.2(h) because the right to bail is procedural and within the province of the court rules. *Id.* at 502.

In *State v. Hunt*, the court noted that the first whole sentence of RCW 10.73.040 (the section Miller relies on) is superseded by CrR 3.2(f).[14] 76 Wn. App. 625, 628 n.1, 886 P.2d 1170 (1995).

---

[13] At that time, former CrR 3.2(h) read,
> A defendant (1) who is charged with a capital offense, or (2) who has been found guilty of a felony and is either awaiting sentence or has filed an appeal, shall be released pursuant to this rule, unless the court finds that the defendant may flee the state or pose a substantial danger to another or to the community. If such a risk of flight or danger exists, the defendant may be ordered detained.

*Smith*, 84 Wn.2d at 500-01.

[14] In 1995, CrR 3.2(h) was numbered as CrR 3.2(f).

We agree because this portion of RCW 10.73.040 conflicts with CrR 3.2, and the court rule controls the procedure for setting an appeal bond. Therefore, Miller is incorrect in asserting that the court must fix and determine the amount of bail pending appeal under RCW 10.73.040.

Miller also argues that bail is excessive when it is not set at an amount reasonably calculated to ensure the asserted governmental interest. Miller further contends that the Eighth Amendment protection against "excessive" bail applies to postconviction release pending appeal. Miller relies on *Hudson v. Parker*, 156 U.S. 277, 15 S. Ct. 450, 39 L. Ed. 424 (1895), for this proposition. But there does not appear to be a discussion of the Eighth Amendment in *Hudson.* The Supreme Court in *Hudson* did state,

> The statutes of the United States have been framed upon the theory that a person accused of crime shall not, until he has been finally adjudged guilty in the court of last resort, be absolutely compelled to undergo imprisonment or punishment, but may be admitted to bail, not only after arrest and before trial, but after conviction, and pending a writ of error.

*Id.* at 285. However, it appears that the federal Bail Reform Act of 1984, 18 USC § 3143(b), reversed this presumption. *United States v. Hart*, 906 F. Supp. 102, 104 (N.D.N.Y. 1995).

Miller also argues that there is a presumption of release for defendants in noncapital cases. But "[t]here is no right to release pending appeal." *Cole*, 90 Wn. App. at 447. And "there is no presumption of innocence pending appeal." *State v. Devin*, 158 Wn.2d 157, 169, 142 P.3d 599 (2006). Trial courts have broad discretion to determine whether or not to grant bail following conviction. *Cole*, 90 Wn. App. at 447.

Here, we do not have the record of the hearing for the motion to release. However, the court found that

> the decision to grant or deny an appeal bond is a discretionary decision of the Court. Release on bail in this case is inappropriate due to the seriousness of the offenses.

23

> The record does not show any extenuating circumstances that would make release on an appeal bond appropriate given the particular facts and circumstances in this case.

CP at 415. Miller was sentenced to 423 months for serious offenses against a child. Based on our limited record, the trial court did not abuse its discretion in denying Miller's motion for bail pending appeal.

## IV. SAG ISSUES

### A. OUTSIDE THE RECORD

Miller raises a number of issues in her SAG. Miller appears to argue that she was denied her right to counsel at a court hearing where an attorney was originally present to represent someone else but then represented her. She also asserts that this attorney was ineffective because he "had no time for discovery to represent" her and that she felt his intent was to get the hearing to proceed further. SAG at 4 (underline omitted). Miller makes a similar argument at a later hearing that an attorney "did nothing to defend" her.[15] *Id.* at 5 (underline omitted). Miller additionally argues that the State failed to investigate child abuse allegations brought to its attention. She further contends that the State suppressed evidence of other suspects in violation of *Brady*.[16] These issues are too vaguely presented or pertain to matters outside the record.

---

[15] Miller additionally argues that law enforcement and her attorney have used the wrong name and that her legal last name is "Rhodes." SAG at 5 (underline omitted). This is not a claim of trial court error and because there is no relief we can give her, we do not address this argument. *See* RAP 10.10.

[16] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). We already addressed and rejected Miller's alleged *Brady* violation claim in her PRP. *See Miller*, No. 49451-5-II, slip op. at 7.

Therefore, we do not address them on direct appeal. RAP 10.10(c); *State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995).

B. ASSERTION TOO VAGUE

Miller argues "officers of the court lied under oath and withheld critical evidence that more than likely could have changed the procedure as well as the outcome of [her] case." SAG at 7 (underline omitted). Miller does not specify which officers of the court she alleges lied or what evidence was withheld. RAP 10.10(c) requires that the appellant "inform the court of the nature and occurrence of alleged errors." Here, Miller's assertion of error is too vague to allow us to identify the issue, and we do not reach it.

C. ILLEGAL ARREST

Miller argues that she was illegally arrested and charged without probable cause and that she was taken into custody on December 20, 2013, to prevent her from appearing at a fact finding hearing.

During Gallagher's testimony, defense counsel asked what probable cause Gallagher had to arrest Miller. Gallagher responded, "I would have to review my probable cause statement at that point. I don't know what it was." 4 VRP at 622. Defense counsel also asked,

> [DEFENSE COUNSEL]. The judge found probable cause based on a statement issued by somebody out of the prosecutor's office. Isn't that true?
> [GALLAGHER]. Yes, sir.
> [DEFENSE COUNSEL]. Okay. Not your statement of probable cause.
> [GALLAGHER]. It was based on my statement of probable cause. Again, I haven't read the charging documents to that -- at that point. I haven't read my probable cause statement. I couldn't testify to what it said.

*Id.* at 623.  Here, we do not have Gallagher's statement of probable cause in the record.  Therefore, based on this record, we cannot review whether she had probable cause to arrest Miller.  As a result, we do not reach this issue.

D.  PREJUDICE

Miller appears to argue that the trial court's denial of her motion for bail pending appeal is proof that the court "prejudiced" her.  SAG at 7 (underline omitted).  However, as explained above, "[t]here is no right to release pending appeal."  *Cole*, 90 Wn. App. at 447; *Smith*, 84 Wn.2d at 499.  Trial courts have broad discretion to decide whether to release a defendant pending appeal.  *Cole*, 90 Wn. App. at 447.  Because this issue was addressed above, we do not discuss it further.

E.  THIRD AMENDED INFORMATION

Miller argues that when the State filed the third amended information, Miller did not recall entering a plea and she did not remember her attorney telling her of the charges prior to the trial.

The State filed a third amended information during trial.  The trial court asked defense counsel whether he discussed the third amended information with Miller and defense counsel asked for a break to discuss it with Miller.  Later the court asked,

> THE COURT: . . . I take it that you took the time during our break to talk to your client about the third amended information?
> [DEFENSE COUNSEL]:  I did, Your Honor.  She can be arraigned on it.  She's familiar with the amendment now.  She's prepared to be arraigned and waive arraignment, waive further advisement, enter a plea of not guilty to the third amended complaint, waive reading.

4 VRP at 602-03.  Therefore, the record shows that Miller was informed of the third amended information and that she entered a plea of not guilty.  Miller's claim fails.

CONCLUSION

We conclude that the State presented sufficient evidence to support the first degree child assault and second degree child assault convictions, the trial court's findings that Miller's crimes manifested deliberate cruelty were supported by the evidence, and the trial court properly exercised its discretion in denying Miller's request for an appeal bond. We reject Miller's SAG arguments. Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

MAXA, C.J.

LEE, J.